530 S.E.2d 676

Kay K. MEADOWS, Plaintiff
Below, Appellant,

v.

WAL–MART STORES, INC., Defendant
Below, Appellee.

Beverly Judy and Karen Austin, Individ-
ually and as Class Representatives,
Plaintiffs Below, Appellants,

v.

Sheetz Corporation, Defendant
Below, Appellee.

Christine Remsberg, et al., Plaintiffs
Below, Appellants,

v.

Kmart Corporation, Defendant
Below, Appellee.

Elizabeth Besaw Hutzler and Contessa
Besaw Vanorsdale, Plaintiffs
Below, Appellants,

v.

Easton Molding Corporation, a West
Virginia Corporation, Defendant
Below, Appellee.

H. Vance Stewart, Plaintiff
Below, Appellee,

v.

Waco Equipment Co., dba Waco Scaf-
folding & Equipment, Defendant
Below, Appellant.

Nos. 25325–25329.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 26, 1999.

Decided June 9, 1999.

Dissenting Opinion of Chief Justice
Starcher Feb. 16, 2000.

Concurring Opinion of Justice
Davis June 9, 2000.

206

Gregory W. Sproles, Esq., Breckinridge, Davis & Sproles, Summersville, West Virginia, Attorney for Meadows.

Roger A. Wolfe, Esq., Victoria J. Sopranik, Esq., Jackson & Kelly, Charleston, West Virginia, Attorneys for Wal–Mart Stores, Inc.

Robert J. Schiavoni, Esq., David M. Hammer, Esq., Hammer, Ferretti & Schiavoni, Martinsburg, West Virginia, Attorneys for Judy, Austin, Remsberg, et al., Hutzler and Vanorsdale.

Garry G. Geffert, Martinsburg, West Virginia, Attorney for Judy and Austin.

Richard D. Owen, Esq., J. David Fenwick, Esq., Goodwin & Goodwin, Charleston, West Virginia, Attorneys for Sheetz Corporation.

Larry W. Blalock, Esq., Jackson & Kelly, New Martinsville, West Virginia, Attorney for Kmart Corporation.

Clarence E. Martin, III, Esq., Susan R. Snowden, Esq., Martin & Seibert, Martinsburg, West Virginia, Attorneys for Easton Molding Corporation.

Barbara G. Arnold, Esq., Parkersburg, West Virginia, Attorney for Stewart.

Thomas P. Mannion, Esq., Brian D. Sullivan, Esq., Reminger & Reminger, Cleveland, Ohio, Attorneys for Waco Equipment Co.

Susan R. Snowden, Esq., Martin & Seibert, West Virginia Manufacturer's Association and West Virginia Retailer's Association, for Amici Brief.

Robert M. Steptoe, Jr., Esq., Rodney L. Bean, Esq., Steptoe & Johnson, West Virginia Chamber of Commerce, for Amicus Brief.

MAYNARD, Justice:

These five cases have been consolidated to determine the issue of whether the West Virginia Wage Payment and Collection Act, W.Va.Code §§ 21–5–1 to 21–5–18 (hereinafter "the WPCA" or "the Act"), requires employers to pay employees unused sick leave or vacation pay in the same manner as wages, regardless of the terms of the applicable employment policy, upon separation from employment. After careful consideration, we conclude that it does not. Instead, the specific provisions concerning fringe benefits of the applicable employment policy determine whether the fringe benefits at issue are included in the term "wages" under the WPCA.

## I. FACTS

The salient facts of each of the cases before us are as follows.

### No. 25325—Kay K. Meadows v. Wal–Mart Stores, Inc.

The appellant, Kay K. Meadows, was employed by the appellee, Wal–Mart Stores, Inc., from September 1990 until her resignation in October 1996. Meadows' sick leave was governed by Wal–Mart's "Illness Protection Policy." The relevant portions of that policy state:

*Illness Protection Hours Accrual*

Regular full-time Hourly Associates begin to *accrue* Illness Protection Hours immediately upon employment. Accrued hours are not "available" and may not be used until the Associate has worked six (6) continuous months.

● **Rate of Accumulation**—Illness Protection Hours accrue at the rate of .023077 hours for each service hour. At this rate, Associates accumulate an average of one-half (½) work day per month, or a total of six (6) average work days per year. . . .

● **Maximum Accumulation**—Illness Protection Hours may accumulate up to a maximum of 192 hours.

● **Conversion to Personal Time**—Accrued Illness Protection Hours beyond the maximum accumulation of 192 hours will automatically convert to Personal Time at a conversion rate of 50%. Personal Time may be used without restriction. . . .

\* \* \* \* \* \*

● **Qualifying Illness/Injury**—The Illness Protection Benefit may be used when absence from work is due to:

★ The Associate's illness/injury.

★ Providing care to the Associate's son/daughter who is ill/injured.

\* \* \* \* \* \*

*Termination*

Unused Illness Protection Hours will not be paid to Associates upon termination of employment except where required by state law.

At the time of her resignation, Meadows had accumulated 192 hours of sick leave for which she was not paid. She was paid for the sick leave which had been converted to personal time. Meadows instituted the underlying action in the Circuit Court of Nicholas County alleging that Wal–Mart failed to pay her accumulated sick leave upon separation from employment in violation of the WPCA.

By order of October 23, 1997, the circuit court granted Wal–Mart's motion for summary judgment. The circuit court held in part:

In enacting West Virginia Code § 21–5–1 *et. seq.* the legislature did not intend for every employee to be paid for unused sick leave at the time they terminate their employment, but intended it to ensure that employees would be paid wages. To decide otherwise might leave employers in a position wherein they may decide not to offer sick pay benefits to their employees, since the Act does not require employers to offer their employees fringe benefits in the first instance. Consequently, employers can, through an employee policy or other means, limit an employee's entitlement to sick pay exclusively to instances when the employee is ill and, therefore,

can provide that unused sick pay is not payable upon an employee's separation from employment.

It is from this order that Meadows appeals.

### No. 25326—Beverly Judy and Karen Austin, individually and as class representatives v. Sheetz Corporation

The appellants, Beverly Judy and Karen Austin, individually and as class representatives, were employees of the appellee, Sheetz, Inc.[1], for less than a year before termination. Sheetz provides its employees with a fringe benefit package that includes sick or personal days and vacation time. Sheetz's policy regarding sick days states in part:

All employees may be eligible to earn one sick or personal day after every four months of continuous employment with the company.

*The four month periods are:*

*—January 1 through April 30,—May 1 through August 31,—September 1 through December 31*

Eligibility is based on hours worked during the four month period. All employees who work and (sic) average of 32 or more hours per week during a period will earn one paid sick/personal day.

Sick/personal days may accumulate to twelve total days, beyond which no further accumulations will occur until the total falls below twelve. If an employee does not have any accumulated sick or personal days, he or she will not receive any wage payment for any day or days in which he or she did not report to work, unless otherwise approved by the Vice President of Human Resources. *Should an employee with accumulated personal and sick days leave the company, no payment will be made for these days.*

The policy pertaining to vacation time provided:

Hourly store employees and assistant managers may earn up to three weeks vacation under the following schedule:

One (1) week after 1st anniversary date.

Two (2) weeks after 3rd anniversary date.

---

1. Sheetz, Inc. operates convenience stores.

Three (3) weeks after 10th anniversary date.

### a. Hourly Employee Vacation

Hourly employees will earn vacation on their anniversary date. By this we mean that to earn a vacation, an hourly employee must be employed by Sheetz for 52 consecutive weeks.

At termination, the appellants were not paid for unused vacation time because they had not been employed by Sheetz for 52 consecutive weeks.

As a result, the appellants filed a complaint against Sheetz in the Circuit Court of Berkeley County alleging that Sheetz's failure to pay unused vacation time constitutes a violation of the WPCA. The appellants subsequently amended their complaint to allege that Sheetz failed to pay them for unused sick/personal days upon termination. By order of May 20, 1997, the circuit court granted summary judgment on behalf of Sheetz on the issue of vacation pay, concluding that,

2. The West Virginia Wage Payment and Collection Act (W.Va.Code § 21–5–1 et seq.) requires an employer to pay an employee accrued wages and fringe benefits within 72 hours of that employee's discharge. W.Va.Code § 21–5–4(b) (1996). The Act, however, does not require an employer to pay wages and fringe benefits that have not accrued.

3. Sheetz's policy is that employees are entitled to paid vacation only after they have been employed at Sheetz for 52 consecutive weeks.

4. Because Plaintiffs had not been employed at Sheetz for 52 consecutive weeks at the times of their respective separations, Plaintiffs had not earned any vacation and thus are not entitled to compensation for unused vacation under the Act.

By order of December 9, 1997, the circuit court granted summary judgment on behalf of Sheetz on the issue of sick/personal pay and held in pertinent part,

The Act ... does not "require fringe benefits to be calculated contrary to any agreement between an employer and his employees which does not contradict the provisions of [the WVWPCA]." Id. § 21–5–1(c).

3. Plaintiffs agreed in writing that "[a]ny personal days accumulated during employment and not taken before the last day of work w[ould] not be paid." Consistent with that Agreement, Sheetz's policy provides: "Should an employee with accumulated personal and sick days leave the company, no payment will be made for these days." The Agreement and policy are unambiguous in providing that accumulated sick or personal days will not be compensated upon separation from employment, whatever the circumstances surrounding the separation.

4. The Agreement does not contradict the provisions of the WVWPCA.

The appellants now appeal both orders to this Court.

### No. 25327—Christine Remsberg, et al. v. Kmart Corporation

The appellants are an unperfected class of former Kmart employees all of whom resigned or were discharged from the appellee Kmart. They fall into two subclasses: those who separated from employment before their one year anniversary dates, and those who separated from employment after those dates. The appellants were employed by Kmart under a vacation policy contained in a handbook and posted policy notices. The "Kmart Associates Handbook" provides, in part, the following:

Paid vacations are earned according to an associate's length of service.

Associates whose work schedules are less than 40 hours per week, including part-time associates, are eligible to receive a paid vacation on a pro-rate basis at a rate equivalent to their average weekly hours of work for an 8–week period prior to their vacation in accordance with the following schedule:

| Company Service | Total Fiscal Vacation Earned |
| --- | --- |
| 1 year of service, but less than 2 years | 1 week (5 days) |
| 2 years of service, but less than 5 years | 2 weeks (10 days) |
| 5 years of service, but less than 15 years | 3 weeks (15 days) |
| 15 years of service, but less than 25 years | 4 weeks (20 days) |
| 25 years and over | 5 weeks (25 days) |

Vacation time may not be carried from one fiscal year into the next. The Company will not pay for vacation time that is not taken.

\* \* \* \* \* \*

A description of this policy is posted on the Company bulletin board.

An accompanying policy in effect from January 1994 through January 31, 1995 [2] elaborated,

Associates who retire under provision of the Company's Pension Plan will be paid all vacation due for the current fiscal year, less any paid vacation previously taken in the current fiscal year. In addition, those associates who elect to retire and their termination date on the payroll is January 31, will be eligible to be paid all vacation due for the next fiscal year.

\* \* \* \* \* \*

Associates who resign or are terminated from the Company will be paid $\frac{1}{12}$ of their current year vacation due for each full month of service completed during the fiscal year, less any paid vacation previously taken. In the event of an associate's death, the same policy provisions will apply.

\* \* \* \* \* \*

No sick/personal time will be paid any associate after notice of resignation is received or upon discharge. To receive payment for unused sick/personal time, associates must be on the payroll December 31.

Pursuant to this policy, employees who separated from Kmart prior to their one year anniversary date were not paid any vacation benefit. Those who were separated from employment after one year were paid according to the $\frac{1}{12}$ formula.

On October 25, 1994, the appellants instituted a class action in Berkeley County Circuit Court on behalf of former employees separated from employment with Kmart within five years of that date. By order of November 25, 1997, the circuit court granted summary judgment on behalf of Kmart concluding, in part:

This court is of the opinion that there is no provision in the Act which requires "accrual" of fringe benefits such as the vacation benefit herein and that the Act actually recognizes and authorizes nonaccrual of such benefits through specifically providing that: "nothing herein contained shall require fringe benefits to be calculated contrary to any agreement between an employer and his employees which does not contradict the provisions of this article."

The appellants appeal this order.

### No. 25328—Elizabeth Besaw Hutzler and Contessa Besaw Vanorsdale v. Easton Molding Corporation

Elizabeth Besaw Hutzler and Contessa Besaw Vanorsdale, the appellants in this case, are former employees of the appellee, Easton Molding Corporation. Both appellants worked for the appellee for less than a year. The applicable portion of the appellee's vacation policy in effect during the appellants' employment provides:

40.1 During the first year of employment, employees are not eligible for a paid vacation.

40.2 After the first successive year of employment, the employee is entitled to one (1) week paid vacation. One months notice is required in order for appropriate changes to be made.

40.3 After three (3) years of successive employment, the employee is entitled to two (2) weeks paid vacation. For production reasons, these two weeks cannot be taken together. One month prior notice must be given to your supervisor for appropriate changes to be made.

40.4 Two weeks is the maximum paid vacation time that an employee can take. After four (4) years of employment, an employee can take a third week vacation

---

**2.** The record contains copies of annual posted policy notices dating from February 1, 1989 through January 31, 1996. The provisions listed above are substantially the same throughout this time period. The pro rata formula set forth above was instituted as company policy on February 1, 1993. Prior to that time, vacation time for the current fiscal year was pro rated on a half year basis. This change is not material to the decision of this case.

not paid. This will count as an excused leave of absence.

40.5 The vacations must be taken in the following year earned. The vacations will not be allowed to accumulate.

40.6 There will be no reimbursements for vacations, good attendance days, or sick days not taken.

Upon separation from employment, the appellants were not paid any vacation time.

As a result, the appellants filed suit in the Circuit Court of Berkeley County alleging a violation of the WPCA for the appellee's failure to pay all accrued fringe benefits capable of calculation upon separation from employment. The appellants originally moved for summary judgment on October 23, 1996 on the basis that the same issue had been litigated against the appellee in *Simpson v. Easton Molding Corp.* In that case, the plaintiff, Betty Simpson, sued for the recovery of vacation pay which the appellee had failed to pay her upon separation from employment. Like the appellants, Simpson worked for the appellee for less than a year. In accordance with W.Va. R.Civ.P 68, the appellee made an offer of judgment which Simpson accepted. Consequently, the circuit court entered judgment in favor of Simpson pursuant to Rule 68.

The circuit court originally denied the parties' cross-motions for summary judgment. The parties again filed cross-motions for summary judgment on the issue of the appellee's obligation under the WPCA to pay vacation benefits upon termination from employment. On November 24, 1997, the circuit court granted summary judgment on behalf of the appellee. The court concluded in relevant part:

> Vacation pay is a fringe benefit that Easton offered to its employees during the Plaintiffs' employment with the company. This benefit, however, was only provided to employees who completed at least one year of employment with the company.... The Wage Payment and Collection Act

does not require an employer to offer vacation benefits to its employees. Moreover, the Wage Payment and Collection Act does not prohibit an employer from requiring its employees to complete one year of employment before they are eligible to receive vacation benefits.

### *Case No. 25329—H. Vance Stewart v. Waco Scaffolding and Equipment Company*

In the last case before us, the appellee, H. Vance Stewart, was employed by the appellant, Waco Scaffolding and Equipment Company, for approximately eight and one half years before he was terminated [3] on November 6, 1995. The appellee subsequently brought the underlying action against the appellant alleging that the appellant failed to compensate him for unused sick days within seventy-two hours of separation from employment. The applicable provisions of the appellant's sick leave policy stated:

> Sick Leave refers to illnesses, physical conditions and off-the-job injuries which require the employee to miss time from work.

> Employees are allocated a total of six (6) company paid sick days per calendar year after they have completed 90 days of service.

> Illness must be valid. Manager, at his/her discretion, may ask for a doctor's certificate on the third consecutive day of absence.

> \* \* \* \* \* \*

> In the case of illness of an immediate family member, and in accordance with the provisions of the Family and Medical Leave Act, the employee may use his/her own unused sick days available. Additional days required can be taken out of vacation days available, or unpaid at the discretion of the Manager subject to our Personal and Family Leave Policy.

**3.** In its brief to this Court, the appellant states that the appellee was "laid-off." In its final order, however, the circuit court states that the appellee was "terminated." This finding of fact is not challenged by the appellant. In any case,

according to 42 C.S.R. 5–2.10 (March 29, 1990), "[a]n employee who is laid off shall be paid all wages not later than the next regular payday through regular pay channels, or by mail if requested."

Any unused sick days allocated during the current year will be carried forward and accumulated for either future sick days or Short Term Disability, subject to the maximum accumulation of ninety (90) days.

In addition, the policy provisions concerning retirement provided that "[o]n normal retirement from Waco, an employee will be paid at the then current rate of salary for cumulative sick days not taken during the course of employment up to a maximum of ninety (90) days."

The Circuit Court of Wood County found that the appellant was required to pay the appellee his unused sick time. The circuit court held:

[W]hen a contract is silent on an issue, then, under the provisions of the [WPCA], unused but accrued sick leave is considered a fringe benefit and therefore wages under the [WPCA]; and, upon leaving employment—whether Plaintiff was terminated or laid off is not really an issue for this ruling—an employee is entitled to be compensated for that absent a controlling provision of a contract that says he is not entitled to it.

The circuit court awarded the appellee $7,642.56 for accrued sick leave in addition to thirty days of liquidated damages in the amount of $6,033.60.

## II. STANDARD OF REVIEW

■■■ Four of the cases herein were disposed of below on summary judgment. The record in the fifth case, No. 25329, indicates that it also was disposed of on summary judgment.[4] "A circuit court's entry of summary judgment is reviewed *de novo.*" Syllabus Point 1, *Painter v. Peavy,* 192 W.Va. 189,

451 S.E.2d 755 (1994). Also, "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963). Finally, "[i]nterpreting a statute presents a purely legal question subject to our *de novo* review on which neither party bears the burden of proof." Syllabus Point 1, *West Virginia Human Rights Com'n v. Garretson,* 196 W.Va. 118, 468 S.E.2d 733 (1996).

## III. DISCUSSION

The issue in these consolidated cases concerns the proper interpretation of W.Va.Code § 21–5–1(c) (1987), and it is one of first impression in this Court. W.Va.Code § 21–5–1(c) states:

The term "wages" means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation. As used in sections four, five, eight-a, ten and twelve [§§ 21–5–4, 21–5–5, 21–5–8a, 21–5–10 and 21–5–12], of this article, the term "wages" shall also include then accrued fringe benefits capable of calculation and payable directly to an employee: Provided, That nothing herein contained shall require fringe benefits to be calculated contrary to any agreement between an employer and his employees which does not contradict the provisions of this article.

The term "fringe benefits" is defined by W.Va.Code § 21–5–1(*l*) to mean, "any bene-

---

**4.** In case number 25329, the circuit court apparently granted summary judgment *sua sponte* to the appellees. This Court has stated that, "[o]rdinarily, in the absence of a written motion for summary judgment by one of the parties, the court is not authorized *sua sponte* to grant a summary judgment." Syllabus Point 2, *Gavitt v. Swiger,* 162 W.Va. 238, 248 S.E.2d 849 (1978). However, in Syllabus Point 4, *Southern Erectors, Inc. v. Olga Coal Co.,* 159 W.Va. 385, 223 S.E.2d 46 (1976), we recognized a limited exception to the general rule:

Where a court acts with great caution, assuring itself that the parties to be bound by its

judgment have had an adequate opportunity to develop all of the probative facts which relate to their respective claims, the court may grant summary judgment under Rule 56, W.VA. R.C.P, *sua sponte.*

In the instant case, the court granted judgment after a hearing in which it determined that all issues concerning sick pay were legal issues. The court's factual findings were not challenged below or before this Court, and there is no claim that judgment was granted before adequate development of the facts. Therefore, we conclude that the court's grant of summary judgment falls within the limited exception set forth above.

fit provided an employee or group of employees by an employer, or which is required by law, and includes regular vacation, graduated vacation, floating vacation, holidays, sick leave, personal leave, production incentive bonuses, sickness and accident benefits and benefits relating to medical and pension coverage."

All of the employees involved in these cases were separated from their employment by either discharge or resignation. The payment of their wages upon separation from employment is governed by W.Va.Code § 21–5–4(b) and (c) (1975) which provide:

(b) Whenever a person, firm or corporation discharges an employee, such person, firm or corporation shall pay the employee's wages in full within seventy-two hours.

(c) Whenever an employee quits or resigns, the person, firm or corporation shall pay the employee's wages no later than the next regular payday, either through the regular pay channels or by mail if requested by the employee, except that if the employee gives at least one pay period's notice of intention to quit the person, firm or corporation shall pay all wages earned by the employee at the time of quitting.

The general issue common to all the instant cases is whether the above provisions require employers to pay employees their unused sick leave or vacation benefits in the same manner as wages, regardless of the terms of the applicable employment policy, upon separation from employment.

In setting forth their respective positions on this issue, the parties have presented compelling arguments for our consideration.[5] According to the employees in this case, the language of W.Va.Code § 21–5–1(c) is plain and unambiguous. The employees define the word "accrued" in W.Va.Code § 21–5–1(c) as "to accumulate periodically." Therefore, "then accrued fringe benefits" refer to those benefits which have accumulated at the time

of separation from employment. The word "capable" in the context of "capable of calculation" means that the employer has the ability to calculate the accumulated benefits owed to an employee on the last day of employment. Finally, "calculation" refers to the method of determining the amount owed based on the length of service and rate of pay. When the terms which modify "fringe benefits" are defined in this manner, the sole issue in determining whether fringe benefits are included in the term "wages" is whether the fringe benefits are capable of calculation. If so, the amount of "then accrued fringe benefits" readily can be established at any given point in time. Under this interpretation, employers are required to pay employees a prorated share of their fringe benefits upon separation from employment regardless of any eligibility requirements or restrictions contained within the terms of employment.

This interpretation, the employees contend, is in accord with the clause in W.Va. Code § 21–5–1(c) which provides that the method of calculation of fringe benefits may be determined by agreements between employers and employees. It is also supported by the purpose of the WPCA, remedial in nature, which is to protect working people and assist them in the collection of compensation wrongly withheld. *Citing Mullins v. Venable,* 171 W.Va. 92, 297 S.E.2d 866 (1982). In addition, they contend that the Legislature's 1981 amendment of W.Va.Code § 21–5–1(c) to include fringe benefits within the definition of "wages" evinces its intent to protect fringe benefits in the same manner as wages. Further, the employees cite several cases from jurisdictions with wage payment and collection statutes similar to West Virginia's in which it was held that fringe benefits must be paid like wages upon an employee's separation from employment.[6] Finally, while the employees acknowledge that an employer may decide whether to

---

**5.** We acknowledge the filing of amici curiae briefs in these cases by the West Virginia Manufacturer's Association, the West Virginia Retailer's Association and the West Virginia Chamber of Commerce. It is the position of amici curiae that the WPCA does not require an employer to calculate fringe benefits contrary to an agreement between employer and employee which does not contradict the provisions of the Act.

We appreciate the participation of amici curiae, and we have carefully considered their concerns.

**6.** Specifically, the employees list Oklahoma, California and Illinois as states with wage payment and collection statutes which protect fringe benefits in a manner similar to the WVWPCA.

provide fringe benefits and the amount of fringe benefits to provide, they contend that once benefits are offered, these benefits enjoy the same protection as wages so that the statutory obligation to pay them cannot be abandoned by "forfeiture schemes." *Citing* W.Va.Code § 21–5–10 (1975). The employees conclude, therefore, that, according to W.Va.Code § 21–5–1(c), all fringe benefits which are capable of calculation and payable directly to an employee are included in the term "wages."

The employers, on the other hand, argue just as vigorously that W .Va.Code § 21–5–1(c) plainly and unambiguously allows employers to limit employees' entitlement to fringe benefits by specific provisions contained in the applicable employment policy. This is made clear, say the employers, by the fact that only fringe benefits which meet the specific criteria set forth in W.Va.Code § 21–5–1(c) are included in the term "wages." The employers define the term "accrued" to mean "vested, or presently due and payable." Therefore, in order to be included as "wages" under W.Va.Code § 21–5–1(c), fringe benefits must be not only capable of calculation and payable directly to an employee, but also vested under the provisions of the employment agreement. The employers emphasize that the WPCA does not require the granting of fringe benefits or prescribe vesting or calculation rules for benefits which are provided. They conclude from this that the specific terms of the applicable employment policy must determine whether fringe benefits are included in the term "wages" under W.Va.Code § 21–5–1(c). For the following reasons, we agree with the employers.

■ The issue before us demands that we either apply or construe the provisions of W.Va.Code § 21–5–1(c). As a preliminary matter, we deem it necessary to review the time-honored tools of statutory construction that will assist us in this task. In deciding the meaning of a statute, this Court begins with the principle that "[j]udicial interpretation of a statute is warranted only if the statute is ambiguous[.]" Syllabus Point 1, in part, *Ohio County Com'n v. Manchin,* 171 W.Va. 552, 301 S.E.2d 183 (1983). "[A] statute which is clear and unambiguous should

be applied by the courts and not construed or interpreted." *Carper v. Kanawha Banking & Trust Co.,* 157 W.Va. 477, 517, 207 S.E.2d 897, 921 (1974) (citation omitted).

■ Few would dispute that the provision before us is ambiguous. In fact, the WPCA has long confounded attorneys and courts alike. Perhaps the most confusing part of the WPCA is the one that confronts us in the instant cases concerning the payment of fringe benefits upon an employee's separation from employment. The specific difficulty is the lack of guidance provided by both the statute and its regulations in clarifying what constitutes "accrued" leave that must be paid at separation from employment. It is well established that "[a] statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning." *Hereford v. Meek,* 132 W.Va. 373, 386, 52 S.E.2d 740, 747 (1949). This is certainly true of the provision before us. We find, therefore, that W.Va.Code § 21–5–1(c) is ambiguous in that "then accrued fringe benefits" is susceptible to differing constructions. Further, we have stated that "[a] statute that is ambiguous must be construed before it can be applied." Syllabus Point 1, *Farley v. Buckalew,* 186 W.Va. 693, 414 S.E.2d 454 (1992). Accordingly, our first step is to construe the meaning of W.Va.Code § 21–5–1(c).

■ This Court has long held that "[i]n the interpretation of a statute, the legislative intention is the controlling factor; and the intention of the legislature is ascertained from the provisions of the statute by the application of sound and well established canons of construction." *State v. General Daniel Morgan Post No. 548, V.F.W.,* 144 W.Va. 137, 144, 107 S.E.2d 353, 358 (1959) (citation omitted). In parsing the language of a statute for its meaning, we are mindful that "a cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute." *State v. General Daniel Morgan Post No. 548, V.F.W.,* 144 W.Va. at 147, 107 S.E.2d at 359 (citations omitted). Also,

"[g]enerally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use." Syllabus Point 4, *id.; see also, McComas v. Bd. Of Educ. of Fayette County,* 197 W.Va. 188, 205, 475 S.E.2d 280, 297 (1996) ("when interpreting statutes we give credence to the normal usage of the word[.]"). Finally, we are "informed when necessary by the policy that the statute was designed to serve." *West Virginia Human Rights Com'n v. Garretson,* 196 W.Va. 118, 123, 468 S.E.2d 733, 738 (1996) (footnote and citation omitted). Concerning the policy undergirding the WPCA, this Court has described it as "remedial legislation designed to protect working people and assist them in the collection of compensation wrongly withheld." *Mullins v. Venable,* 171 W.Va. 92, 94, 297 S.E.2d 866, 869 (1982) (citation omitted). Accordingly, "we must construe the statute liberally so as to furnish and accomplish all the purposes intended." *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 777, 461 S.E.2d 516, 523 (1995) (citations omitted). With these tools in hand, we now proceed to the issue before us.

■ We begin our task with the language of the statute. As stated above, we must give significance and effect to every word in the provision. According to W.Va.Code § 21–5–1(c), only fringe benefits which are "then accrued," "capable of calculation," and "payable directly to an employee" are included in the term "wages." The parties agree concerning the meaning of "capable of calculation." They also agree that fringe benefits may be calculated in a manner agreed upon by the employees and employers so long as the agreement does not contradict the provisions of W.Va.Code § 21–5–1 *et seq.* The parties do not agree, however, concerning the meaning of the term "then accrued."

In order to define "then accrued," we give the term its familiar and ordinary meaning. A survey of several lexicographers indicates support for both definitions urged on us by the parties. The Random House Dictionary of the English Language Unabridged 13 (2nd Ed.1987) defines the word "accrue" as,

1. to happen or result as a natural growth, addition, etc. 2. to be added as a matter of periodic gain or advantage, as interest on money. 3. *Law.* to become a present and enforceable right or demand.

Webster's Third New International Dictionary Unabridged 13 (1966) includes substantially the same definitions in different order:

1: to come into existence as an enforceable claim: vest as a right ... 2: to come by way of increase or addition: arise as a growth or result ... 3: to be periodically accumulated in the process of time whether as an increase or a decrease[.]

The first definition listed in the most recent edition of Merriam Webster's Collegiate Dictionary 8 (10th Ed.1997) is, likewise, "to come into existence as a legally enforceable claim." This definition is consistent with this Court's definition of the word "accrue" in cases arising in diverse contexts. In *Dunn v. Bank of Union,* 74 W.Va. 594, 599, 82 S.E. 758, 760 (1914), the Court concluded that the liability of a debtor to a creditor accrued the instant the creditor lent money to the debtor. The Court defined "accrue" as to " 'come into existence'; 'to become vested.' " Similarly, in Syllabus Point 1, *Wood Coal Co. v. State Compensation Com'r,* 119 W.Va. 581, 195 S.E. 528 (1938), the Court held that "[a]ccrued compensation under Code, 23–4–6, [of the workers' compensation statute] is awarded compensation, due and payable." The Court explained:

The word "accrued," when employed in connection with payment of money, is commonly understood to designate money, the right to which has vested. "The technical meaning of the word 'accrue,' as defined in the dictionary, is the possession of a present, enforceable right. A note is said to accrue when it becomes due and payable."

*Wood Coal Co.,* 119 W.Va. at 583–584, 195 S.E. at 529 (citations omitted). In light of the above, we believe the proper definition of the word "accrued" in W.Va.Code § 21–5–1(c) is "vested."

The concept of vesting is concerned with expressly enumerated conditions or requirements all of which must be fulfilled or satisfied before a benefit becomes a presently enforceable right. Because the WPCA con-

tains no such conditions or requirements, the payment of fringe benefits can only be governed by the terms of employment found in employment policies promulgated by employers and agreed to by employees. Accordingly, the terms of the applicable employment policy, and not the WPCA, determine whether fringe benefits are included in the term "wages" under W.Va.Code § 21-5-1(c).

We believe this construction furnishes the term "accrued" its ordinary meaning and gives effect to every word in W.Va.Code § 21-5-1(c). It also recognizes that in drafting this provision, the Legislature was not silent concerning the eligibility requirements for fringe benefits commonly set forth in employment policies, but rather acknowledged these requirements by stating that fringe benefits must be, *inter alia*, "then accrued" in order to be included in the term "wages." The interpretation of W.Va.Code § 21-5-1(c) advanced by the employees, on the other hand, presumes that the Legislature intended to implicitly nullify all provisions in employment policies relating to the vesting of fringe benefits. Not only is this interpretation inconsistent with the language of W.Va.Code § 21-5-1(c), it is also at odds with the statutory scheme of which that provision is a part.

The WPCA does not create a right to fringe benefits. Rather, it reserves the question of fringe benefits to the bargaining process between employers and employees. This Court has stated:

> Vacation pay and other similar benefits are not gratuities which employers benevolently bestow upon their employees. Rather they are integral components of a compensation package bargained for and agreed upon by the parties. One expects that both employers and employees strive for a fair exchange in the employment market place. A factor the employee undoubtedly considers when gauging the fairness of an employment offer is the value of benefits the employer offers in addition to take home pay. Conversely, the employer also takes into account the cost of fringe

benefits when determining the salary or hourly wage rate it will offer its prospective employees. Obviously if fringe benefits such as vacation and sick pay were absent from the compensation package, wages would be higher.

*Farley v. Zapata Coal Corp.*, 167 W.Va. 630, 635, 281 S.E.2d 238, 242 (1981). It is clear that an employer is free to set the terms and conditions of employment and compensation, including fringe benefits, and employees are free to accept or reject these conditions. As noted above, the WPCA does not contain eligibility or vesting requirements governing the payment of fringe benefits. Accordingly, when fringe benefits are part of a compensation package, they are governed by the terms of employment. Further, nothing in the WPCA prevents employers from conditioning the vesting of a fringe benefit right on some eligibility requirement in addition to the performance of services or from providing, such as in the instant cases, that unused fringe benefits will not be paid to employees upon separation from employment. We emphasize, however, that the terms of employment must be express and specific concerning the vesting of fringe benefits. Generally, employers draft the policies which are relied upon by employees. Therefore, any ambiguity in the terms of employment will be construed in favor of the employees. Accordingly, we conclude that W.Va.Code § 21-5-1(c) simply means that if under the terms of employment an employee is entitled to the payment of fringe benefits, the payment of these benefits has the same status as unpaid wages.[7]

Finally, we find further support for our construction of W.Va.Code § 21-5-1(c) from analogous statutory provisions contained in the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461 (1994). ERISA protects only those pension benefits which are both accumulated and vested. *See Berard v. Royal Elec., Inc.*, 795 F.Supp. 519, 526 (D.R.I.1992) ("ERISA was enacted to protect an employees' [sic] accrued, vested pension benefits."). The

7. In addition to the reasons set forth above in support of our construction of W.Va.Code § 21-5-1(c), we are concerned that if we were to hold

differently, we would be providing a significant disincentive for employers to continue to offer fringe benefits.

terms "accrued" and "vested" are not synonymous. *Berard, id.* "An accrued benefit is the benefit a participant earns annually as calculated according to the formula specified by the [benefit] plan." *Berard,* 795 F.Supp. at 527 (citations omitted); *See also,* 29 U.S.C. § 1002(23)(A) (1994). Vesting, on the other hand, "means that a participant has gained 'a nonforfeitable right to receive his [or her] entire accrued benefit.'" *Id.,* 795 F.Supp. at 526 (citation omitted); *See also,* 29 U.S.C. § 1002(19) (1994). Accordingly, only benefits which have both accumulated and vested survive an employee's separation from employment under ERISA.[8]

Similarly, the WPCA protects as "wages" only those fringe benefits which have both accumulated and vested. In order to ensure that the amount of accumulated benefits may be determined, only those benefits which are "capable of calculation" under the terms of the applicable employment policy are protected. Also, the fringe benefits must have vested according to the eligibility requirements of the terms of employment.[9] By arguing that all accumulated benefits are protected as wages upon separation from employment regardless of the vesting requirements of the terms of employment, the employees disregard the language of W.Va. Code § 21–5–1(c), the historical employment context in which the WPCA operates, as well as the purpose of that statute.

 In summary, we hold that, pursuant to W.Va.Code § 21–5–1(c) (1987), whether fringe benefits have then accrued, are capable of calculation and payable directly to an employee so as to be included in the term "wages" are determined by the terms of employment and not by the provisions of W.Va. Code § 21–5–1(c). Further, the terms of employment may condition the vesting of a fringe benefit right on some eligibility requirement in addition to the performance of services, and these terms may provide that unused fringe benefits will not be paid to employees upon separation from employment. However, the terms of employment must be express and specific so that employees understand the amount, if any, of the fringe benefits owed to them upon separation from employment. Accordingly, this Court will construe any ambiguity in the terms of employment in favor of employees.

Having stated the applicable law, we now proceed to decide the cases before us according to the specific facts of each.

### No. 25325—Kay K. Meadows v. Wal–Mart Stores, Inc.

 According to the clear language of Wal–Mart's "Illness Protection Policy," "[u]nused Illness Protection Hours will not be paid to Associates upon termination of employment except where required by state law." As noted above, Wal–Mart is free to place conditions and restrictions upon employees' eligibility to receive fringe benefits. The restriction at issue does not violate the WPCA. Accordingly, we find that the circuit court correctly granted summary judgment to Wal–Mart and we affirm.

### No. 25326—Beverly Judy Austin and Karen Austin, et al. v. Sheetz Corporation

 The appellants complain that they should have been paid both sick and vacation pay upon separation from employment. Sheetz's policy plainly states, however, that "[s]hould an employee with accumulated personal and sick days leave the company, no payment will be made for these days." Therefore, the appellants were owed no sick pay at termination. Also, the appellants claim they were wrongly denied vacation pay. There is no dispute, however, that the appellants were employed by Sheetz for less than a year. Sheetz's policy provides that "[h]ourly employees will earn vacation on their anniversary date. By this we mean that to earn a vacation, an hourly employee must be employed by Sheetz for 52 consecutive weeks."

---

**8.** Under ERISA, a pension plan must specify a vesting schedule, subject to the minimum vesting requirements of 29 U.S.C. § 1053(a) (1994 and 1997 Supp.). which determine when an employee's right to receive his accrued benefit becomes nonforfeitable.

**9.** It is important to note that terms of employment are required by W.Va.Code § 21–5–9(3) (1975) to be made available to employees in writing.

The appellants were not employed for fifty-two weeks and so were owed no vacation pay. Accordingly, we find that the circuit court properly granted summary judgment on behalf of Sheetz, and we affirm.

### No. 25327—Christine Remsberg, et al. v. Kmart Corporation

■ The appellants who were separated from Kmart's employment prior to their one year anniversary date allege that Kmart's failure to pay them any vacation benefit constitutes a violation of the WPCA. Kmart's policy states, in relevant part, that "[p]aid vacations are earned according to an associate's length of service [as follows:] 1 year of service, but less than 2 years—1 Week (5 days)." Because these appellants were not employed for one year, they failed to earn any vacation time according to the express provisions of Kmart's policy. Accordingly, we affirm the circuit court's award of summary judgment on behalf of Kmart as to the appellants who were employed at Kmart for less than a year.

■ Those appellants who separated from employment with Kmart after their one year anniversary date were paid vacation benefits according to the ½ formula set forth above. They contend that they were not paid all vacation time due them upon separation from employment. We agree. In the record, there is a transcript of a deposition in which Kmart's ½ formula was explained by William Kobs, Kmart's W.Va.R.Civ.P. 30(b)(6) designee. According to Mr. Kobs, an employee who begins work on February 1, 1995 is eligible for five days of vacation on February 2, 1996. However, if that employee resigns or is terminated on February 2, 1996, he receives no vacation pay. If that employee is employed until March 2, 1996, and had used no vacation time, he would receive ½ of his vacation eligibility for the current year. We do not believe this is in accord with a fair reading of Kmart's policy.

According to Kmart's policy, employees earn vacation days upon annual employment anniversary dates according to their years of service. The policy does not provide that these unused vacation days are forfeited if not taken prior to separation from employment. In addition, while the policy describes the ½ formula in effect upon separation from employment, it is silent concerning the unused vacation days already earned in the previous year of employment. The policy language appears to indicate, therefore, that the employee in the above example should receive the five days of vacation pay already earned on February 2, 1996 in addition to ½ of the five vacation days earned on March 2, 1996.

Of course Kmart is free to institute the policy described by Mr. Kobs. Kmart is likewise free to provide in its policy that employees who separate from employment receive no unused vacation pay at all. Kmart must do so, however, in plain and specific terms. The policy, as currently written, is ambiguous. As noted above, this Court will construe the policy in favor of employees. Therefore, we interpret Kmart's policy to mean that employees who separate from Kmart's employment within the same fiscal year as an annual employment anniversary date on which they have earned, but not yet used, vacation days, shall be paid for those vacation days in addition to any vacation time subsequently earned under the ½ formula in the same fiscal year.[10] Accordingly, we reverse the circuit court's summary judgment order as to those former Kmart employees who separated from employment after their one year anniversary date, and we remand this case for proceedings consistent with this opinion.

### No. 25328—Elizabeth Besaw Hutzler and Contessa Besaw Vanorsdale v. Easton Molding Corporation

The first issue in this case is whether collateral estoppel operates to bar the appellee from litigating the issue of the payment of fringe benefits. The appellants argue that all the conditions of collateral estoppel articulated by this Court in *Haba v. Big Arm Bar and Grill, Inc.*, 196 W.Va. 129, 468 S.E.2d

---

**10.** Kmart's policy provides that "[a]ll vacation must be taken during the fiscal year in which it was due or will be forfeited."

915 (1996) are present here. According to the appellants, the issue of whether the appellee is required to pay fringe benefits to employees who have been employed by the appellee for less than a year is identical to the issue raised in Count II of the *Simpson*[11] case. Second, there was a judgment order entered as to Counts I and II of *Simpson* that constitutes a final adjudication on the merits. The third requirement, that the party was involved in the prior action, is satisfied because the appellee was the named defendant in *Simpson.* Finally, the fourth requirement, that the party against whom collateral estoppel is used had a full and fair opportunity to litigate the issue in the prior action, is met because the appellee was represented by counsel who had ample opportunity to develop all facts relevant to the litigation.

The appellee responds, first, that the appellants failed to preserve their collateral estoppel argument for appeal to this Court. The appellee notes that the appellants advanced their collateral estoppel argument in their original motion for summary judgment and in a rebuttal argument to the appellee's cross-motion for summary judgment. Both parties' motions for summary judgment were denied at this time. Subsequent to a status conference in which both parties stipulated that there were no factual issues, the parties filed renewed motions for summary judgment. The appellants' renewed motion and their response to the appellee's motion for summary judgment did not address the collateral estoppel issue. The appellee concludes that, by failing to renew the collateral estoppel issue, the appellants waived it and, therefore, cannot now raise it on appeal.

Alternatively, the appellee avers that the appellants failed to demonstrate to the circuit court that they should be permitted to use collateral estoppel offensively. Also, the appellee argues that collateral estoppel in the instant case is improper as a matter of law because a judgment under W.Va.R.Civ.P. 68 is akin to a settlement between the parties and is not a judgment on the merits.

We believe the appellants successfully preserved the collateral estoppel issue for appeal to this Court. "Our general rule is that nonjurisdictional questions not raised at the circuit court level, but raised for the first time on appeal, will not be considered." *Barney v. Auvil,* 195 W.Va. 733, 741, 466 S.E.2d 801, 809 (1995) (citations omitted). Here, the issue was obviously raised below. The record reveals, as noted by the appellee, that the appellants raised the issue of collateral estoppel in their motion for summary judgment and supporting memorandum dated October 24, 1996, and in their reply to the appellee's summary judgment motion dated December 9, 1996. Also, "[i]n the exercise of its appellate jurisdiction, this Court will not decide nonjurisdictional questions which have not been decided by the court from which the case has been appealed." Syllabus Point 11, *Work v. Rogerson,* 149 W.Va. 493, 142 S.E.2d 188 (1965), *overruled on other grounds, Pearson v. Dodd,* 159 W.Va. 254, 221 S.E.2d 171 (1975). Again, the circuit court decided this issue. By order of January 8, 1997, the circuit court denied both the appellants' and the appellee's motions for summary judgment. While the circuit court's order is conclusory and does not specify the issues on which it ruled, it clearly denied the appellants' motions in which the collateral estoppel issue was raised. Therefore, we find that the issue was brought to the circuit court's attention, and the circuit court considered it and ruled on it.

Further, we disagree that the appellants' failure to restate the issue in their renewed motions waived the issue for review in this Court. After the circuit court's rejection of the collateral estoppel argument in its January 8, 1997 order, the appellants should not be faulted for failing to raise it again. In addition, we do not find the cases cited to us by the appellee in support of its argument for waiver applicable to the specific facts before us. Accordingly, we conclude that the question of collateral estoppel is properly before us.

---

11. *Simpson v. Easton Molding Corp.* referred to previously in this opinion, is the case in which the plaintiff, Betty Simpson sued Easton Molding

Corp. in part for recovery of vacation pay which Easton Molding Corp. did not pay her upon separation from employment.

This Court has never decided the issue of whether a judgment pursuant to W.Va. R.Civ.P. 68 constitutes a final adjudication on the merits for collateral estoppel purposes. Other courts, however, have considered this question. The Court of Appeals of New Mexico discussed this issue at great length in *Pope v. Gap, Inc.*, 125 N.M. 376, 961 P.2d 1283 (1998). Specifically, that court was asked to determine whether a judgment pursuant to Rule 1–068 of the New Mexico Rules of Civil Procedure constitutes a determination or admission of liability.[12]

Because New Mexico's Rule 1–068 is identical to its federal counterpart, the court looked to federal law for guidance. W.Va. R.Civ.P. 68,[13] likewise, is based upon and almost identical to Rule 68 of the Federal Rules of Civil Procedure. The court in *Pope* first noted that "[u]nder federal law, courts apply ordinary contract principles in determining what was intended in an offer of judgment ... under Federal Rule of Civil Procedure 68." *Pope*, 125 N.M. at 379, 961 P.2d at 1286 (citations omitted). The court concluded from this that a Rule 68 judgment is comparable to a consent judgment which it described as "a negotiated agreement between the parties to the suit entered of record in the cause with the consent of the court." *Pope*, 125 N.M. at 382, 961 P.2d at 1289. This Court has similarly characterized a consent decree as "a contract or agreement between the parties consented to by the court." *Stannard Supply Co. v. Delmar*

*Coal Co.*, 110 W.Va. 560, 564, 158 S.E. 907, 909 (1931) (citation omitted).

In light of the similarity between consent judgments and judgments pursuant to Rule 68, in determining whether a Rule 68 judgment constitutes a judicial determination of liability, the New Mexico court looked to case law analyzing whether consent judgments are entitled to res judicata and collateral estoppel effect. The court found that "[m]ost courts are in accord that a consent judgment is a final judgment on the merits for res judicata purposes and thus, the parties are barred from relitigating claims settled by the consent judgment." *Pope*, 125 N.M. at 382, 961 P.2d at 1289 (citations omitted). This is true of this Court which has held in this context, "[a] judgment by consent or a court order recording a compromise settlement has the same force and effect as a judgment entered after full contest of the issues involved." *State ex rel. Prince v. West Virginia Dept. of Hwys.*, 156 W.Va. 178, 182, 195 S.E.2d 160, 162 (1972) (citations omitted), *see also Hustead v. Ashland Oil, Inc.*, 197 W.Va. 55, 475 S.E.2d 55 (1996).[14]

Concerning whether a consent judgment should be given collateral estoppel effect, however, the New Mexico court found that courts have traditionally been divided.[15] Among courts which have ruled on this question, some "have allowed the consent judgment to be used affirmatively to establish a party's liability in a subsequent action." *Pope*, 125 N.M. at 383, 961 P.2d at 1290. *Citing Card v. Budini*, 29 A.D.2d 35, 285

---

**12.** Rule 1–068 of the New Mexico Rules of Civil Procedure is substantially similar to W.Va. R.Civ.P. 68 and also is based on Rule 68 of the Federal Rules of Civil Procedure.

**13.** W.Va.R.Civ.P. 68 (1995) states in relevant part:

*(a) Offer of judgment.*—At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against him for the money or property or to the effect specified in his offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the court shall direct entry of the judgment by the clerk.

This is the version of Rule 68 in effect during the judgment in the *Simpson* case. The rule was amended to incorporate minor changes by order adopted February 19, 1998, which became effective April 6, 1998.

**14.** This Court has stated in Syllabus, *Hannah v. Beasley*, 132 W.Va. 814, 53 S.E.2d 729 (1949),

To justify the application of the doctrine of *res judicata*, * * * there must be a concurrence of four conditions, namely: (1) identity in the thing sued for; (2) identity of the cause of action; (3) identity of persons, and of parties to the action; (4) identity of the quality in the persons for or against whom the claim is made.

**15.** This Court has never decided this issue.

N.Y.S.2d 734, 736 (N.Y.App.Div.1967); *Public Serv. Elec. & Gas Co. v. Waldroup*, 38 N.J.Super. 419, 119 A.2d 172 (App.Div.1955); and Annotation, 91 A.L.R.3d 1170 § 6[c]. The court noted, however, that this approach "has been strongly criticized by modern legal commentators who argue that collateral estoppel rules do not require that a consent judgment bind a party to facts which were originally in issue in an action that was settled." *Pope*, 125 N.M. at 383, 961 P.2d at 1290. *Citing* Jay N. Varon, *Promoting Settlements And Limiting Litigation Costs By Means Of The Offer of Judgment: Some Suggestions For Using And Revising Rule 68*, 33 Am.U.L.Rev. 813, 840–41 (1984); and Fleming James, Jr., *Consent Judgments As Collateral Estoppel*, 108 U.Pa.L.Rev. 173 (1959). "Thus, more recently, most courts that have addressed the issue appear to have adopted the view that a consent judgment, including a [Rule 68] judgment, is not a judicial determination of the issues raised in the action, but is primarily a reflection of the settlement agreement between the parties." *Id.* *Citing, Scosche Industries, Inc. v. Visor Gear, Inc.*, 121 F.3d 675, 678–79 (Fed.Cir. 1997) [rehearing denied, 135 F.3d 773 (1997) ]; *American Mut. Liab. Ins. Co. v. Michigan Mut. Liab. Co.*, 64 Mich.App. 315, 235 N.W.2d 769, 776 (1975); *McIlroy Bank & Trust v. Acro Corp.*, 30 Ark.App. 189, 785 S.W.2d 47, 49 (1990); *In re Carrero*, 94 B.R. 306, 309 (Bkrtcy.S.D.N.Y.1988); *Sleck v. Butler Bros.*, 53 Ill.App.2d 7, 202 N.E.2d 64, 67 (1964); *Selig v. Barnett*, 233 Ark. 900, 350 S.W.2d 176, 180 (1961); *City of Miami*, 664 F.2d at 440; *Gagne*, 453 A.2d at 1165; and Annotation, 91 A.L.R.3d 1170 § 6[a]. Courts and commentators who have adopted this view reason,

> because a judgment can be given collateral estoppel effect only as to issues actually and necessarily litigated, and in the case of a consent judgment, the parties do not actually litigate the matters put in issue but have settled the case, one of the prerequisites for collateral estoppel is unsatisfied, and thus a consent judgment should not bar the relitigation of those issues in a subsequent action.

*Id.* In addition, "[o]ur federal courts have adopted a similar view on the scope and

effect of consent judgments in the bankruptcy context." *Pope*, 125 N.M. at 384, 961 P.2d at 1291. *Citing, In re Young*, 91 F.3d 1367, 1376 (10th Cir.1996); and *In re N.M. Properties, Inc.*, 18 B.R. 936, 941 (Bkrtcy.D.N.M. 1982). Finally, the Restatement (Second) of Judgments § 27, p. 257 (1982) (requirements of collateral estoppel) states:

> In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section does not apply with respect to any issue in a subsequent action. The judgment may be conclusive, however, with respect to one or more issues, if the parties have entered an agreement manifesting such an intention.

Based on the foregoing reasoning and authority, the Court of Appeals of New Mexico concluded that "a [Rule 68] judgment that is silent regarding liability has no issue preclusive effect." *Pope*, 125 N.M. at 384, 961 P.2d at 1291.

 We agree with this conclusion. It has been stated:

> The primary purpose of Rule 68 is to encourage the compromise and settlement of litigation. By encouraging compromise, Rule 68 discourages both protracted litigation and vexatious lawsuits. "The Rule prompts both parties to a suit to evaluate the risks and costs of litigation, and to balance them against the likelihood of success upon trial on the merits."

*Mallory v. Eyrich*, 922 F.2d 1273, 1277 (6th Cir.1991) (citations omitted). This purpose would be nullified, however, if defendants who make offers of judgment were estopped by these judgments from subsequently litigating the same or similar issues against other parties. Also, we are persuaded by the approach of the court in *Pope* as well as the weight of authority set forth in that decision. Finally, we too are convinced that a judgment pursuant to Rule 68 simply does not constitute a final adjudication of the merits which is demanded by our collateral estoppel rule. Rather, in concerning whether collateral estoppel applies to a Rule 68 judgment, the contract principles noted above should govern. That is, effect should be given to

the intent of the parties to the judgment as stated in the judgment order. We hold, therefore, that judgment entered pursuant to W.Va.R.Civ.P. 68, if silent regarding liability and the collateral estoppel effect of the judgment, has no issue preclusive effect and is not an admission of liability by the offerer. Of course, issue preclusive effect will be given to a judgment pursuant to W.Va.R.Civ.P. 68 which expressly admits liability or states that it is to be given collateral estoppel effect, thereby reflecting the intent of the parties.

In applying this rule to the instant case,[16] we find that collateral estoppel does not operate to bar the appellee from litigating the issue of the payment of fringe payments. As noted above, the appellants must show that the prior Rule 68 judgment contains an express admission of liability by the appellee or a statement by the appellee that the judgment is to be given collateral estoppel effect. The appellants have failed to do this. Although a copy of the Rule 68 judgment is not contained in the record, in the appellants' pleadings below and in this Court, the appellants nowhere assert that the judgment contains an admission of liability by the appellee or the intent that the judgment have a collateral estoppel effect. Instead, the appellants state in their December 9, 1996 reply in support of their summary judgment motion,

> there exists only a Judgment Order entering judgment against Easton Molding for a sum certain. There is no statement in the record of the Simpson case that Easton Molding wished to continue to deny the allegations in the complaint or that Easton Molding did not wish to be found to be liable for the wrongs alleged in the Simpson complaint.

According to our rule articulated above, this is not enough to constitute an admission of liability or the intent that the judgment order have a collateral estoppel effect. Accordingly, the circuit court properly denied the appellants' motion for summary judgment based on collateral estoppel.

The second issue for us to determine, therefore, is whether the circuit court correctly found that the appellee did not violate the WPCA. It is undisputed that the appellants worked for the appellee for less than a year. The appellee's employment policy provides that "[d]uring the first year of employment, employees are not eligible for a paid vacation." We have found that the terms of employment govern employees' eligibility to receive fringe benefits. Because the appellants were employed for less than a year, under the terms of employment they were not eligible to receive vacation pay. Therefore, there was no violation of the WPCA. Accordingly, we affirm the order of the circuit court.

### Case No. 25329—H. Vance Stewart v. Waco Scaffolding and Equipment Company

In our final case, the appellant, Waco Scaffolding and Equipment Company, argues that the circuit court incorrectly concluded that its employment handbook was silent on the issue of payment of unused sick days. It is the appellant's contention that the policy specifically provides that an employee was only entitled to such benefits if they retired after the age of sixty-five and had ten years of service. The appellant also avers that, at a minimum, it was entitled to present evidence to the finder of fact to demonstrate that the handbook was not silent on the issue. We disagree. First, as we stated above, the terms of employment must be express and specific so that employees understand what is due them. The terms of employment in the instant case do not expressly state that employees who are sepa-

---

16. The appellants sought below to use the doctrine of collateral estoppel offensively. "Where a plaintiff presses for collateral estoppel, it is said to be 'offensive' on the theory that the plaintiff is using the estoppel as an affirmative device to avoid having to prove liability against the defendant." *Conley v. Spillers,* 171 W.Va. 584, 591, 301 S.E.2d 216, 222 (1983). We have stated that "the offensive use of collateral estoppel is gener- ally disfavored." *Tri–State Asphalt Prod. v. Dravo Corp.,* 186 W.Va. 227, 230, 412 S.E.2d 225, 228 (1991). In addition, "a stranger's right to utilize the doctrine of collateral estoppel is not automatic because it may depend on the peculiar facts of a given case." *Conley,* 171 W.Va. at 592, 301 S.E.2d at 224. Therefore, "the trial court should have a rather broad discretion in determining when it should be applied." *Id.*

rated from employment will not receive cumulative sick days not taken during the course of employment. In fact, the sick pay policy is silent on the issue of the payment of unused sick pay upon separation from employment.

Second, the appellant cites a portion of the policy handbook which states that an employee is entitled to sick pay if he or she retires after the age of sixty-five and has ten years of service. This provision, however, is not helpful to employees seeking to learn what benefits are owed them upon separation from employment. Appearing in the handbook in the section titled "Normal Retirement," the provision relied upon by the appellant states in full:

> On normal retirement from Waco, an employee will be paid at the then current rate of salary for cumulative sick days not taken during the course of employment up to a maximum of ninety (90) days. Payment of unused sick days will be paid out on the usual, customary, biweekly pay schedule. Normal retirement is defined by Waco for employees at least 65 years of age or older and having a minimum of ten (10) years of service with the company.

While it is arguable that employees may infer from this provision that "only" employees who are separated from employment upon normal retirement will be paid any unused sick pay, it is by no means clear. As noted, the above provision appears in the section of the handbook concerning retirement, not in the section on "sick days." Also, it specifically concerns retirement and does not purport to be an exhaustive treatment of sick pay benefits. The fact remains, therefore, that the policy handbook is silent concerning the payment of unused sick pay to employees, other than normal retirees. This Court will not draw the inference from this silence urged on us by the appellant.

In addition, we find no reason for the appellant to present further evidence below to demonstrate that the policy handbook is not silent on the issue of unused sick pay. The policy handbook is in the trial record. Its provisions are silent on the issue of unused sick pay to separated employees who are not retirees. According to the rule articulated above, the WPCA requires the payment of unused sick benefits under these specific circumstances. Therefore, we affirm the circuit court order which granted summary judgment on behalf of the appellee.

Finally, we emphasize that the employees' arguments based on fairness have not escaped our notice. We agree that in an ideal world all employees would receive sick pay and vacation benefits. We are constrained, however, by our constitutional role.

> Under the division of powers provision of the Constitution of this State, the authority to make a law is within the exclusive province of the legislative branch of the government. This Court exists and functions as a part of the judicial branch of the government, and is empowered to construe and interpret the law, but not to enact it.

*State ex rel. Graney & Ford v. Sims*, 144 W.Va. 72, 83, 105 S.E.2d 886, 893 (1958). Further, "[i]t is not the province of the courts to make or supervise legislation, and a statute may not, under the guise of interpretation, be modified, revised, amended, distorted, remodeled, or rewritten[.]" *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W.Va. 137, 145, 107 S.E.2d 353, 358 (1959) (citation omitted). It simply is not this Court's function to decide what the law ought to be, but rather to construe and apply the law as the Legislature has enacted it to the facts before us. The Legislature has not mandated the payment of fringe benefits to all employees nor has it mandated the payment of all unused fringe benefits to employees upon separation from employment. We are confident, therefore, that we have construed W.Va.Code § 21–5–1(c) in accord with the Legislature's intent.

## IV. CONCLUSION

For the reasons set forth above, we dispose of the instant consolidated cases in the following manner:

No. 25325—Affirmed.

No. 25326—Affirmed.

No. 25327—Affirmed in part, Reversed in part and Remanded with directions.

No. 25328—Affirmed.

No. 25329—Affirmed.

STARCHER, Chief Justice, dissenting:

(Filed Feb. 16, 2000)

I dissent to the majority opinion's subversion of the employment laws of this State, and its reversion to 19th century fictional concepts of employee contracts. In the days of the Industrial Age, courts invented the fantasy that every employer and every employee sits down across a table, and after a few days of negotiations and bargaining, they hammer out a contract of employment. The West Virginia Legislature had the sense to recognize in 1917 that railroad workers were getting the short end of the fictional "bargain," and enacted the Wage Payment and Collection Act, to require railroad employers to timely pay their employees the wages that they had earned after work has been performed. The Legislature has since expanded the Act to apply to every employment contract created in the State of West Virginia.

The Act, specifically *W.Va.Code*, 21–5–1(c), defines "wages" as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation."[1] Under this statute, the employer and employee can "agree" on a way to calculate wages (*i.e.*, $5.25 in cash per hour worked). Once the employee performs and provides services or labor, then the employer must respond and compensate the employee pursuant to the "contract."

*W.Va.Code*, 21–5–1(c) specifically says that the term "wages" "shall also include then accrued fringe benefits capable of calculation and payable directly to an employee[.]"

A "fringe benefit" includes such things as vacation, holidays, sick leave, or production bonuses. *W.Va.Code*, 21–5–1(1).[2] Hence, under the statute, an employer and an employee can also "agree" on a way to calculate fringe benefits that are payable just like wages (*i.e.*, 1.5 days of sick leave for each month worked). Again, once the employee performs and provides services or labor, then the employer must respond and compensate the employee with the fringe benefit pursuant to the means of calculation set forth in the "contract."

The statute says that wages include fringe benefits "capable of calculation" and "payable directly to an employee." "Calculate" means to "ascertain or determine beforehand, esp. by arithmetic," while "payable" means "due ... owed, owing, outstanding, unpaid, receivable." *Oxford Desk Dictionary and Thesaurus, American Edition* (1997).

Hence, the term "wages" in *W.Va.Code*, 21–5–1(c) includes vacation and sick leave that can be arithmetically determined before services are rendered by the employee, and which are due, owing, and as yet unpaid to an employee who has provided services. These fringe benefits became part of the plaintiff-employees' overall compensation earned during their periods of employment.

There is nothing in the Wage Payment and Collection Act that requires an employer to offer fringe benefits. Nothing in the Act compels an employer to give his employees time off for vacation, or for holidays, or for sick leave. Employers offer fringe benefits because it appeals to employees, and makes the job more enticing.

However, once an employer makes the choice to offer a fringe benefit, then *W.Va. Code*, 21–5–1(c) takes over and ensures that

1. *W.Va.Code*, 21–5–1(c) defines "wages" in the following way:

 (c) The term "wages" means compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation.... [T]he term "wages" shall also include then accrued fringe benefits capable of calculation and payable directly to an employee: Provided, That nothing herein contained shall require fringe benefits to be calculated contrary to any agreement between an employ-

er and his employees which does not contradict the provisions of this article.

2. *W.Va.Code*, 21–1–5(1) defines "fringe benefits" in the following manner:

 (1) The term "fringe benefits" means any benefit provided an employee or group of employees by an employer, or which is required by law, and includes regular vacation, graduated vacation, floating vacation, holidays, sick leave, personal leave, production incentive bonuses, sickness and accident benefits and benefits relating to medical and pension coverage.

if the employee performs the specified work in expectation of receiving the fringe benefit, then the employer may not make the earned benefit illusory. Specifically, the employer cannot condition the receipt of the fringe benefit on the occurrence of some uncertain future event.

The majority opinion holds that an employer *can* make fringe benefits illusory and contingent upon uncertain occurrences, stating at Syllabus Point 5 that "whether fringe benefits have then accrued, are capable of calculation and payable directly to an employee so as to be included in the term 'wages' are determined by the terms of [the] employment [contract] and not by the provisions of W.Va.Code § 21–5–1(c)." This holding ignores our long-standing precedent that every contract implicitly incorporates existing legal principles. We held, in Syllabus Point 2 of *Huntington Water Corp. v. City of Huntington,* 115 W.Va. 531, 177 S.E. 290 (1934), that:

> All general legal principles affecting contracts enter by implication into and form a part of every contract, as fully as if specifically expressed therein.

*In accord, McGinnis v. Cayton,* 173 W.Va. 102, 105, 312 S.E.2d 765, 768 (1984) ("[A]ll of the general legal principles affecting contracts at the time a particular agreement is entered into form a part of that contract as fully as if they were specifically expressed within it[.]")

In other words, the definition of wages established in *W.Va.Code,* 21–5–1(c) controls the employment contract; the majority is wrong in holding otherwise.

The California Supreme Court once considered and rejected many of the same arguments posited by the employers (and adopted by the majority opinion) in the instant case. In *Suastez v. Plastic Dress–Up Co.,* 31 Cal.3d 774, 183 Cal.Rptr. 846, 647 P.2d 122 (1982), the employer had a policy of awarding employees with paid vacation time on the anniversary of the employee's employment. The employer refused to pay vacation benefits to anyone whose employment terminated before that anniversary date.

The employee in *Suastez* had his employment terminated 3 months before his anniversary date, and he requested a *pro rata* share of his vacation pay. The employer argued (like the employers in the instant case) that employment on the anniversary date was a condition precedent to the "vesting" of vacation rights, and refused to pay the employee any portion of his vacation pay.

The California court rejected the employer's position and held that the employee was entitled to a *pro rata* share of his fringe benefits. The court stated that a fringe benefit like vacation pay "is not a gratuity or a gift, but is, in effect, additional wages for services performed." 183 Cal.Rptr. at 849, 647 P.2d at 125. In other words, fringe benefits are "simply a form of deferred compensation ... which inherently are not payable until a time subsequent to the work which earned the benefits...." *Id., citing Posner v. Grunwald–Marx, Inc.,* 56 Cal.2d 169, 14 Cal.Rptr. 297, 363 P.2d 313 (1961). The court concluded that an employee whose employment is terminated mid-year has earned a portion of his fringe benefits as soon as he has performed substantial services for his employer, and that the employer's contract improperly attempted to impose a "condition subsequent which attempts to effect a forfeiture of vacation pay already vested." 183 Cal.Rptr. at 850, 647 P.2d at 126.

In support of its ruling, the California Supreme Court stated that:

> [O]nce it is acknowledged that vacation pay is not an inducement for future services, but is compensation for past services, the justification for demanding that employees remain for the entire year disappears. If some share of vacation pay is earned daily, it would be both inconsistent and inequitable to hold that employment on an arbitrary date is a condition precedent to the vesting of the right to such pay.

The same reasoning applies in the instant case: sick leave is not an inducement for future services, it is compensation for past services. Every day that the plaintiffs went to work, they earned a portion of their sick pay. The plaintiffs did not use their sick leave, but accrued it for future use; upon the termination of their employment, they should

have been compensated for any leave not used.

The rule espoused by the majority opinion concerning sick leave can be summarized as "use it or lose it." Workers who use their sick leave get a day off at home to nurse an "illness," no matter how serious. Workers who tirelessly work, day after day, regardless of any pains or plagues in order to accrue additional sick days—according to the majority opinion, when they say goodbye to the job, they can say goodbye to the pay they would have received, had they stayed home and watched TV from their beds.

In the long run, employers end up being the losers of the "use it or lose it" rule applied by the majority. Under the rule, every employee in the state is encouraged to use their sick days routinely, and employers pay the cost. Instead of competent, trained workers coming to work with minor aches and pains,[3] the employer will be forced to pay overtime to another employee or pay an inexperienced temporary employee to do the job. Rather than compensate the worker by paying them the value of the sick time accrued at the time their employment is terminated years later, the employer pays the worker sick time today plus pays another worker overtime, and/or suffers substantial losses from lowered quality and productivity.

The majority opinion states that the employment "contract" controls the how, when and whether an employee will be compensated in the form of a fringe benefit. I disagree, and firmly believe that if an employer chooses to offer a fringe benefit, then West Virginia law takes over and mandates that such fringe benefits are wages. The law demands that the employee be paid wages for the work performed. *W.Va.Code*, 21–5–

1(c) clearly makes sick pay a form of wages. When the plaintiffs in the instant cases terminated their employment, the employers should have paid the plaintiffs their *pro rata* share of the sick pay they had accumulated and not used.

I therefore dissent.

I am authorized to state that Justice McGRAW joins in this separate opinion.

DAVIS, Justice, concurring:

(Filed June 9, 2000)

I firmly believe the legally correct decision was expressed in the majority opinion. I write separately only for the purpose of emphasizing the basis of my decision to vote with the majority.

### *Employees Have Legitimate Options for Obtaining Nonvested Fringe Benefits*

The common thread running through these consolidated cases was the meaning that should be placed on the phrase "then accrued." The majority opinion has correctly interpreted the phrase to mean "vested." Put into proper context, the majority opinion held that fringe benefits under the West Virginia Wage Payment and Collection Act (hereinafter "ACT"), W. Va.Code § 21–5–1, *et seq.*, are those benefits which have vested during an employee's period of employment.

As an analogy, the majority opinion referenced the Employment Retirement Income Security Act (hereinafter "ERISA"), 29 U.S.C. § 1001, *et seq.* Under ERISA, pension benefits are protected only to the extent that they have accumulated and vested in an employee.[1] That is, Congress sought *not* to impose financial liability upon employers for

---

**3.** I recognize that there are hidden costs in a sick employee coming to the workplace and breathing germs all over everyone else. It is probably cheaper for an employer to force an employee with a communicable disease to stay home, thereby keeping other employees healthy. But what of the employee who has minor surgery, or has discomfort from, say, a slip and fall? Should such an employee take some aspirin and come to work? The majority rule says the employee should stay home and take it easy—use the sick day or lose it.

**1.** ERISA was enacted in part to prevent employees and their beneficiaries from being deprived of anticipated benefits in the event their retirement plan is terminated. 29 U.S.C. § 1001(a). In the case of a defined benefit plan, accrued benefits are usually determined by years of service, and the amount of accrued compensation is expressed as a percentage. 29 U.S.C. § 1002(35). An employee's right to accrued benefits derived from his or her own contributions to a retirement plan is nonforfeitable at all times. *See Ferguson v. Joiner,* 667 So.2d 1133, 1136 (La.App.1995).

pension benefits that had not vested.[2] Moreover, the definition resorted to by the majority is not foreign to the law in other contexts. *See Estate of Huey v. J.C. Trucking, Inc.,* 837 P.2d 1218, 1221 (Colo.1992) (accrued means to come into existence as an enforceable claim, vest as a right); *Seattle Sch. Dist. No. 1 v. International Union of Operating Eng'rs,* 88 Wash.App. 205, 944 P.2d 1062, 1066 (1997) (accrued means to vest as a right); *Board of Regents v. Putnam County,* 234 Ga.App. 427, 506 S.E.2d 923, 925 (1998) (accrued means due and payable); *South Cent. Bell Tel. Co. v. Tarver,* 704 So.2d 278 (La.Ct.App.1997) (accrued means to come into existence as an enforceable claim); *Singleton v. Kenya Corp.,* 961 P.2d 571, 575 (Colo.Ct.App.1998) (the term unaccrued benefits means unvested benefits).

I do not believe that the state legislature intended for the Act to impose upon employers the financial burden of the payment of nonvested fringe benefits. Indeed, I believe the legislature, if it had so intended, would have affirmatively stated that fringe benefits do not have to be vested to be payable. No such affirmative language appears in the Act.

Two options remain available to employees in their quest to obtain nonvested fringe benefits: unionization and legislation. First, unions regularly negotiate with employers for the payment of nonvested fringe benefits. In fact, the payment of fringe benefits and severance packages are legitimate issues that are included in most collective bargaining agreements. Moreover, the heart and soul of unionization centers around the union's strength to negotiate on a level playing field with employers. Nothing illustrates this point better than these consolidated cases. All companies involved in this litigation are non-union companies. Had the employees been represented by unions, the terms and conditions of the fringe benefit package undoubtedly would have been fully set forth in the collective bargaining agreement.

The second method by which employees may obtain nonvested fringe benefits is through legislation. Nothing prevents employees from urging state legislators to amend the Act, so that it expressly requires the payment of nonvested, fringe benefits.

This Court's function is narrowly tailored to interpret or apply the law. The dissenters in this case, again and again, attempt to rewrite the governing statutes to achieve the result for which they are advocating. Legislation is not the function of this Court. As I indicated in my dissenting opinion in *State ex rel. Farley v. Spaulding,* 203 W.Va. 275, 287, 507 S.E.2d 376, 388 (1998), this Court must never "infringe upon the powers granted to the executive and legislative branches of government." This Court correctly observed in *State ex rel. Barker v. Manchin,* 167 W.Va. 155, 167, 279 S.E.2d 622, 630 (1981), that the separation of powers doctrine embedded in our state constitution, which

> prohibits any one department of our state government from exercising the powers of the others[,] is not merely a suggestion; it is part of the fundamental law of our State and, as such, it must be strictly construed and closely followed. Where one branch of our state government seeks to exercise or to impinge upon the powers conferred upon another branch, we are compelled by this mandate to restrain such action, absent a specific constitutional provision permitting such interference.

(Citations omitted).

For the reasons stated, I concur in the majority opinion.

---

2. Accordingly, the court in *Sejman v. Warner–Lambert Co., Inc.,* 889 F.2d 1346, 1348–49 (4th Cir.1989), held that "[b]ecause, under ERISA, severance benefits are contingent and unaccrued, an employer may unilaterally amend or eliminate the provisions of a severance plan[.]" The *Sej-* *man* decision was followed in *Tobin v. Ravenswood Aluminum Corp.,* 838 F.Supp. 262, 269 (S.D.W.Va.1993), where Judge Haden ruled that "an employer may unilaterally terminate or amend an ERISA severance plan, because severance benefits are contingent and unaccrued."