IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

_____

No. 23-683

_____

FILED

March 11, 2025

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WEST VIRGINIA AUTOMOBILE and TRUCK DEALERS' ASSOCIATION,
THORNHILL AUTO GROUP, INC., MOSES FORD, INC., and
ASTORG FORD of PARKERSBURG, INC.,
Plaintiffs Below, Petitioners,

v.

FORD MOTOR COMPANY,
Defendant Below, Respondent.

_____

Certified Question from the
United States District Court for the Southern District of West Virginia
The Honorable Irene C. Berger, United States District Judge
Civil Action No. 2:22-cv-00291

CERTIFIED QUESTION ANSWERED
_____

Submitted: January 15, 2025
Filed: March 11, 2025

Johnnie E. Brown, Esq.
Geoffrey A. Cullop, Esq.
Pullin, Fowler, Flanagan, Brown
& Poe, PLLC
Charleston, West Virginia

Michael Bonasso, Esq.
Jason A. Proctor, Esq.
Flaherty Sensabaugh Bonasso PLLC
Charleston, West Virginia

Shawn D. Mercer, Esq., Pro Hac Vice          Robert Hugh Ellis, Esq., Pro Hac Vice
Jason T. Allen, Esq., Pro Hac Vice           Dykema Gossett PLLC
W. Kirby Bissell, Esq., Pro Hac Vice          Bloomfield Hills, Michigan
Bass Sox & Mercer
Raleigh, North Carolina

Counsel for Petitioners                      Counsel for Respondent

CHIEF JUSTICE WOOTON delivered the Opinion of the Court.
JUSTICE WALKER dissents and reserves the right to file a separate opinion.
JUSTICE ARMSTEAD dissents and reserves the right to file a separate opinion.
JUSTICE BUNN, deeming herself disqualified, did not participate in the decision.
JUDGE KIRBY sitting by temporary assignment.
JUSTICE TRUMP, deeming himself disqualified, did not participate in the decision.
JUDGE STOWERS sitting by temporary assignment.

**SYLLABUS BY THE COURT**

1. "A de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." Syl. Pt. 1, *Light v. Allstate Ins. Co.,* 203 W. Va. 27, 506 S.E.2d 64 (1998).

2. "Judicial interpretation of a statute is warranted only if the statute is ambiguous and the initial step in such interpretive inquiry is to ascertain the legislative intent." Syl. Pt. 1, *Ohio Cnty. Comm'n v. Manchin*, 171 W. Va. 552, 301 S.E.2d 183 (1983).

3. "Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syl. Pt. 2, *Crockett v. Andrews,* 153 W. Va. 714, 172 S.E.2d 384 (1970).

4. "Generally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use." Syl. Pt. 4, *State v. Gen. Daniel Morgan Post No. 548, Veterans of Foreign Wars,* 144 W. Va. 137, 107 S.E.2d 353 (1959).

5. "'In the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meaning.' Syl. pt. 1, *Tug*

*Valley [Recovery Ctr., Inc.] v. Mingo C[n]ty. Comm'n,* 164 W. Va. 94, 261 S.E.2d 165 (1979)." Syl. Pt. 7, *Wheeling Park Comm'n v. Dattoli,* 237 W. Va. 275, 787 S.E.2d 546 (2016).

6. "A cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute." Syl. Pt. 3, *Meadows v. Wal-Mart Stores, Inc.*, 207 W. Va. 203, 530 S.E.2d 676 (1999).

7. "'It is always presumed that the legislature will not enact a meaningless or useless statute.' Syl. pt. 4, *State ex rel. Hardesty v. Aracoma-Chief Logan No. 4523, Veterans of Foreign Wars,* 147 W.Va. 645, 129 S.E.2d 921 (19[6]3)." Syl. Pt. 3, *United Steelworkers of Am., AFL-CIO, CLC* v. *Tri-State Greyhound Park*, 178 W. Va. 729, 364 S.E.2d 257 (1987).

8. A new motor vehicle dealer's completion of renovations, improvements, or the installation of signs or franchisor image element upgrades in accordance with the requirements of a manufacturer's optional program or incentive provision constitutes installation of signs or franchisor image elements "required and approved" by the manufacturer such that the ten-year grandfather clause set forth in West Virginia Code section 17A-6A-10(1)(i) (2015) applies.

**WOOTON, Chief Justice:**

This matter is before the Court upon the November 21, 2023, order of the

United States District Court for the Southern District of West Virginia, which certified the

following question:[1]

> Does a new motor vehicle dealer's completion of renovations,
> improvements, or image upgrades in accordance with the
> requirements of an optional franchisor program or incentive
> provision constitute installation of image elements "required
> and approved by the manufacturer" such that the ten-year
> grandfather clause found in W. Va. Code § 17A-6A-10(1)(i)
> (2015)[2] applies and the dealership must be deemed in
> compliance with any subsequent incentive programs that
> would require replacement or alteration of those renovations,
> signs, or image elements?

(Footnote added). Upon careful review of the parties' briefs and arguments, the appendix

record, and the applicable law, we now answer the certified question in the affirmative and

remand this matter to the district court for such further proceedings as that court may deem

appropriate.

---

[1]West Virginia Code section 51-1A-3 (1996) provides:

> The Supreme Court of Appeals of West Virginia may answer
> a question of law certified to it by any court of the United States
> . . . if the answer may be determinative of an issue in a pending
> cause in the certifying court and if there is no controlling
> appellate decision, constitutional provision or statute of this
> state.

[2] The parties agree that the 2015 version of West Virginia Code § 17A-6A-10(1)(i)
applies to this case.

1

## I. Facts and Procedural Background

According to the district court's order of certification, the undisputed facts are as follows. The plaintiffs below/petitioners herein, Thornhill Auto Group, Inc. ("Thornhill"), Moses Ford ("Moses"), and Astorg Ford of Parkersburg, Inc. ("Astorg") (collectively referred to as "dealers"), are car dealers that sell Fords and Lincolns at dual facilities.[3] The respondent/defendant below is the manufacturer, Ford Motor Co. ("Ford"). Ford requires all dealers that sell both Ford and Lincoln branded vehicles to enter into separate Sales and Service Agreements ("SSAs") for each brand, and each of the dealers herein had entered into SSAs for both Ford and Lincoln brands.

In 2013, Ford offered a "Ford Dealership Trustmark Facility Assistance Program" ("Facility Assistance Program") to its United States Ford dealers, which provided that any participating dealer was eligible to receive matching funds up to a maximum of $750,000 if it built a Trustmark facility.[4] Facility renovations undertaken pursuant to this program were required to "meet Ford Trustmark standards and include the following: Ford Trustmark Entry Tower and Exterior Brand Wall, Reception and Greater Area, Showroom Vehicle Display Area, Sales Consultation and F&I Area, Customer

---

[3] The dealers are members of the petitioner West Virginia Automobile and Truck Dealers' Association ("Auto Association").

[4] Under the Facility Assistance Program, the design standards were known as Trustmark 1 and Trustmark 3. A Trustmark 1 is a Ford-only facility and a Trustmark 3 is a dual Ford-Lincoln facility.

2

Lounge and Restrooms, Service Department and Write-up Area, Required Furniture for All Customer Areas," among other things. Ford also provided architectural support and approved the design and details of the renovations, reviewing and approving renovations or build elements down to the furniture upholstery. Dealers were not required to participate in the Facility Assistance Program or build Trustmark 3 facilities. However, in order to receive the matching funds to help finance a renovation, a participating dealer was required to comply with "the strictures of the Trustmark Facility Assistance Program." *See supra* text.

Thornhill, Moses, and Astorg each renovated their dealerships within the past ten years preceding the filing of the instant action: in 2013, Moses completed a remodel of its facility to fit the Ford-design standards for a Trustmark 3 facility, and in 2015 and 2016, respectively, Thornhill and Astorg completed remodels of their facilities to Trustmark 3 standards. As Trustmark 3 facilities, the petitioners were allowed to house and sell both Ford and Lincoln brands. Each dealer received matching funds from Ford up to $750,000 for their respective remodels and their renovations complied with the "specific Trustmark Facility design requirements." *See supra* text.

In 2011 Ford commenced the Lincoln Commitment Program ("LCP"), a separate program from the Facility Assistance Program. Dealers could continue to sell Lincoln vehicles without participating in the LCP, which renewed in different iterations annually with Ford having the option to cease offering the program at the end of each yearly

3

iteration. The LCP required a participating dealer to offer a series of customer amenities such as car washes and loaner vehicles, and provided a financial offset to assist the dealers in covering the costs of the amenities.

In 2020, the LCP was materially altered to include a facility element whereby dealers that chose to have an exclusive Lincoln store, known as a "Vitrine," had the opportunity to offset some of the costs incurred. Phase I of the 2020 LCP established incentives and/or required various services dedicated exclusively to the Lincoln dealers.[5] Phase II established an incentive of up to 2.75% of vehicle manufacturer suggested retail price ("MSRP") for "Brand Exclusivity – Facility Exclusivity Design Standard." Moreover, the full 2.75% was available to "[d]ealers that [were] currently in Brand Exclusive facilities (Gallery or newer) or . . . elected to upgrade to a Vitrine facility, and submitted the Dealer Design Enrollment prior to April 1, 2020." Under the 2023 LCP, the dealers, which were Trustmark 3 facilities, did not meet the LCP Facility Exclusivity Design Standard, and did not receive the incentive of 2.75% of the MSRP. However, according to LCPs in effect between July 1, 2020, and December 31, 2022, the dealers received 1% of the MSRP, while the dealers who had or agreed to construct the Lincoln-exclusive Vitrine facilities received 2.75% of the MSRP for each Lincoln sold.[6]

_____

[5] For example, "[a]ll Dual Dealers will be required to have a Lincoln-only Dedicated Sales & Service staff[,]" based on the volume of sales and services.

[6] The district court notes in its certification order that "Ford contests the premise that the Plaintiff dealerships are entitled to the payments but does not contest the

4

Thus, the dealers' Trustmark 3 facilities, updated in accordance with the Facility Assistance Program between 2013 and 2016, did not meet the LCP Facility Exclusivity Design Standard, and they did not receive the 2.75% MSRP incentive under the 2023 LCP. Under the LCPs in effect between July 1, 2020 and December 31, 2022, they received 1% of MSRP, while dealers who had or agreed to construct Lincoln exclusive Vitrine facilities received 2.75% of MSRP for each Lincoln vehicle sold.

The dealers (and the Auto Association) filed a lawsuit in the United States District Court for the Southern District of West Virginia seeking a declaratory judgment and damages from Ford based on allegations that the LCP violated various elements of West Virginia law, including that Ford violated the provisions of West Virginia Code section 17A-6A-10(1)(i), which provides, in relevant part:

> (1) A manufacturer[7] or distributor may not require any new motor vehicle dealer[8] in this state to do any of the following:

---

mathematical calculations in the Plaintiffs' expert report." According to the petitioners' expert's report, which was prepared by Tasha R. Sinclair, Thornhill suffered losses totaling $68,886.89 as of February 23, 2023, Moses suffered losses totaling $223,947.83 as of February 23, 2023, and Astorg suffered losses totaling $118,210.75 as of February 23, 2023. The Court takes no position on this aspect of the case as it is not relevant to the issue before us.

[7] "Manufacturer" is defined as "any person who manufactures or assembles new motor vehicles[.] . . ." W. Va. Code § 17A-6A-3(8), in part.

[8] "New motor vehicle dealer" or "dealer" is defined as

> a person who holds a dealer agreement granted by a manufacturer or distributor for the sale of its motor vehicles, who is engaged in the business of purchasing, selling, leasing,

5

. . . .

(i) To coerce or require any dealer, whether by agreement, program, incentive provision or otherwise, to construct improvements to its facilities or to install new signs or other franchisor image elements that replace or substantially alter those improvements, signs or franchisor image elements completed within the proceeding [sic] ten years that were required and approved by the manufacturer, factory branch, distributor or distributor branch or one of its affiliates. If a manufacturer, factory branch, distributor or distributor branch offers incentives or other payments to a consumer or dealer paid on individual vehicle sales under a program offered after the effective date of this subdivision and available to more than one dealer in the state that are premised, wholly or in part, on dealer facility improvements or installation of franchiser [sic] image elements required by and approved by the manufacturer, factory branch, distributor or distributor branch and completed within ten years preceding the program shall be deemed to be in compliance with the program requirements pertaining to construction of facilities or installation of signs or other franchisor image elements that would replace or substantially alter those previously constructed or installed with that ten year period. This subdivision shall not apply to a program that is in effect with more than one dealer in the state on the effective date of this subsection, nor to any renewal of such program, nor to a modification that is not a substantial modification of a material term or condition of such program[.]

*Id.* (footnotes added). Both the dealers and Ford filed motions for summary judgment.

exchanging, or dealing in new motor vehicles, service of said vehicles, warranty work, and sale of parts who has an established place of business in this state and is licensed by the Division of Motor Vehicles.

*Id.* § 17A-6A-3(11).

6

In their motion, the dealers argued that the foregoing statute requires Ford to provide them with the incentives related to the LCP, which incentives were first offered in 2020 as a component of the pre-existing LCP but were applicable, pursuant to a grandfather clause, during the ten-year period following the construction of their respective Trustmark 3 facilities. More specifically, the dealers argued that "if a dealer has completed a Ford approved facility within the prior ten years, Ford cannot use a program or incentive provision (or anything else) to induce a dealer to 'replace or substantially alter those improvements.'"

Conversely, Ford argued that the foregoing statute does not apply because both the Facility Assistance Program and the LCP are voluntary programs and the dealers' respective decisions to undertake renovations and/or construction of Trustmark 3 facilities pursuant to the Facility Assistance Program were not "required" by Ford as set forth in the statute. In short, Ford argued that West Virginia Code section 17A-6A-10(1)(i) is only implicated when prior facility improvements were required by the manufacturer, or when the subsequent requests for renovations are required or coerced. Ford also argued that the LCP was a voluntary program which provided dealers with the ability to earn funds to help offset the costs of constructing or renovating new Lincoln-exclusive Vitrine facilities – none of which the dealers herein did.

Based on the parties' arguments in their motions for summary judgment, the federal district court determined that there were no prior decisions addressing the

7

provisions of West Virginia Code section 17A-6A-10(1)(i) and that the issue was a question of first impression as to the proper interpretation of the statute. Further, the district court found that the answer to the certified question posed would be determinative of an issue pending in the case. Thus, the district court, after receiving additional briefing from the parties on the certified question issue, certified the single question set forth *supra*. By order entered June 17, 2024, we accepted the certified question and set this matter for oral argument.[9]

## II. Standard of Review

It is well established that "[a] de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." Syl. Pt. 1, *Light v. Allstate Ins. Co.*, 203 W. Va. 27, 506 S.E.2d 64 (1998); *accord* Syl. Pt. 1, *Bower v. Westinghouse Elec. Corp.*, 206 W. Va. 133, 522 S.E.2d 424 (1999) ("This Court undertakes plenary review of legal issues presented by certified question from a federal district or appellate court."). Guided by this standard of review, we address the issue before us.

---

[9] This case was originally set for oral argument on October 9, 2024. By order entered September 12, 2024, the Court, on its own motion, continued the matter generally.

## III. Discussion

The Court is asked to examine for the first time the meaning and application of West Virginia Code section 17-6A-10(1)(i). *See supra* text. In this regard, the certified question focuses on the statutory language concerning the installation of image elements "required and approved" by the manufacturer. In this regard, the dealers argue that the provisions of West Virginia Code section 17A-6A10(1)(i) are unambiguous and explicitly govern the installation of signs or franchisor image elements "*required and approved*" by the manufacturer regardless of whether the underlying decision to make facility improvements pursuant to the Facility Assistance Program was voluntarily. They contend that "[w]hat the statute explicitly regulates is a program that offers payments based, at least in part, on the installation or modification of franchise image elements that are 'required and approved' by the manufacturer for program eligibility." According to the dealers, "a triggering incentive program can be voluntary while the Ford or Lincoln franchisor image elements that are installed pursuant to that voluntary program are 'required and approved' by Ford." Thus, they conclude, the statutory ten-year grandfather applies to them, and they are entitled to the incentives offered under the LCP because they had installed franchisor images required and approved by Ford within the preceding ten years in accordance with the requirements of the Facility Assistance Program.

The dealers further contend that the statute was specifically intended to protect the investments they made under the Facility Assistance Program; had the Legislature not intended for the grandfather clause to be operational where a dealer's

9

decision to make improvements in accordance with a manufacturer's incentive provision was voluntary, it would have expressly provided for that occurrence as it did in other provisions of the same statute. *See, e.g.,* W. Va. Code § 17A-6A-10(1)(j) ("A manufacturer or distributor may not require any new motor vehicle dealer in this state to do any of the following: . . . (j) To condition the award, sale, transfer, relocation or renewal of a franchise or dealer agreement or to condition sales, service, parts or finance incentives upon site control or an agreement to renovate or make substantial improvements to a facility: Provided, That *voluntary and noncoerced acceptance* of such conditions by the dealer in writing, including, but not limited to, a written agreement for which the dealer has accepted separate and valuable consideration, *does not constitute a violation . . . .*") (emphasis added); *id.* § 17A-6A-10(2)(x)(v) ("A manufacturer or distributor may not do any of the following: . . . (x) To require or coerce any new motor vehicle dealer to sell, offer to sell or sell exclusively extended service contract, maintenance plan or similar product, including gap or other products, offered, endorsed or sponsored by the manufacturer or distributor by the following means: . . . (v) *Nothing in this paragraph prohibits a manufacturer or distributor from providing incentive programs to a new vehicle dealer* w*ho makes the voluntary decision* to offer to sell, sell or sell exclusively an extended service contract, extended maintenance plan or similar product offered, endorsed or sponsored by the manufacturer or distributor[.] . . .") (emphasis added).

In contrast, Ford focuses solely on the word "required" in West Virginia Code § 17A-6A-10(1)(i), arguing that

10

> [a]t issue in this certified question to this Court is the scope of this "grandfather clause." Under the . . . [statute], if a West Virginia dealer made certain facility improvements that were "required and approved" by the manufacturer, then that dealer falls under a 10-year grandfather clause. If the dealer did not make such improvements that were "required and approved" by the manufacturer, then the grandfather clause does not apply.

In other words, Ford contends that where, as here, the dealer's decision to participate in the Facility Improvement Program was not "required" by Ford, then the dealer's prior facility improvements were undertaken voluntarily and the statutory grandfather clause does not apply. In support of its argument Ford focuses on the following language contained in the statute: "to construct improvements to its facilities or to install new signs or other franchisor image elements that replace or substantially alter those improvements, signs or franchisor image elements completed within the proceeding [sic] ten years that were required and approved by the manufacturer[.]" Ford contends that the statutory "grandfather clause" is limited in application to "facility improvements or installation of franchiser [sic] image elements *required by and approved* by the manufacturer . . . completed within ten years." *Id.* Again, Ford maintains that because the dealers concede that none of the renovations or improvements that they undertook under the Ford Facility Assistance Program in the last ten years were "required" by Ford, the plain and unambiguous language of the grandfather clause in the statute does not apply to the dealers and there was no violation of the statute by Ford.

11

We are mindful that "[j]udicial interpretation of a statute is warranted only if the statute is ambiguous and the initial step in such interpretive inquiry is to ascertain the legislative intent." Syl. Pt. 1, *Ohio Cnty. Comm'n v. Manchin*, 171 W. Va. 552, 301 S.E.2d 183 (1983). However, "[w]here the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syl. Pt. 2, *Crockett v. Andrews*, 153 W. Va. 714, 172 S.E.2d 384 (1970). Finally, where no ambiguity is present in a statute, "[g]enerally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use." Syl. Pt. 4, *State v. Gen. Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 107 S.E.2d 353 (1959). Likewise, "'[i]n the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meaning.' Syl. pt. 1, *Tug Valley [Recovery Ctr., Inc.] v. Mingo C[n]ty. Comm'n,* 164 W. Va. 94, 261 S.E.2d 165 (1979)." Syl. Pt. 7, *Wheeling Park Comm'n v. Dattoli,* 237 W. Va. 275, 787 S.E.2d 546 (2016); *see also* Syl. Pt. 4, *W. Va. Consol. Pub. Ret. Bd. v. Weaver*, 222 W. Va. 668, 671 S.E.2d 673 (2008) ("'In the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used.' Syllabus point 1, *Miners in General Group v. Hix*, 123 W. Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee-Norse Co. v. Rutledge*, 170 W. Va. 162, 291 S.E.2d 477 (1982)."); Syl. Pt. 6, in part, *State ex rel. Cohen v. Manchin*, 175 W. Va. 525, 336 S.E.2d 171 (1984) ("Effect should be given to the spirit, purpose and intent of the lawmakers without limiting the interpretation in such a manner as to defeat

12

the underlying purpose of the statute. Each word of a statute should be given some effect and a statute must be construed in accordance with the import of its language. Undefined words and terms used in a legislative enactment will be given their common, ordinary and accepted meaning.").

Additionally, "[a] cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute." Syl. Pt. 3, *Meadows v. Wal-Mart Stores, Inc.*, 207 W. Va. 203, 530 S.E.2d 676 (1999). It is presumed that the Legislature intended that "every word used in a statute has a specific purpose and meaning." *State ex rel. Johnson v. Robinson*, 162 W. Va. 579, 582, 251 S.E.2d 505, 508 (1979). Also, "'[i]t is always presumed that the legislature will not enact a meaningless or useless statute.' Syl. pt. 4, *State ex rel. Hardesty v. Aracoma–Chief Logan No. 4523, Veterans of Foreign Wars,* 147 W.Va. 645, 129 S.E.2d 921 (19[6]3)." Syl. Pt. 3, *United Steelworkers of Am., AFL-CIO, CLC* v. *Tri-State Greyhound Park*, 178 W.Va. 729, 364 S.E.2d 257 (1987).

Finally, "[i]t is not for this Court arbitrarily to read into . . . [a statute], that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, we are obliged not to add to statutes something the Legislature purposely omitted." *Banker v. Banker*, 196 W. Va. 535, 546-47, 474 S.E.2d 465, 476-77 (1996) (citing *Bullman v. D & R Lumber Co.,* 195 W. Va. 129, 464 S.E.2d 771 (1995); *Donley v. Bracken,* 192 W. Va. 383, 452 S.E.2d 699 (1994)); *accord War*

13

*Mem'l Hosp., Inc. v. W. Va. Health Care Auth.,* 248 W. Va. 49, 54, 887 S.E.2d 34, 39 (2023); *Phillips v. Larry's Drive-In Pharm., Inc.,* 220 W. Va. 484, 491, 647 S.E.2d 920, 927 (2007); *see also State ex rel. Frazier v. Meadows*, 193 W. Va. 20, 24, 454 S.E.2d 65, 69 (1994) ("Courts are not free to read into the language what is not there, but rather should apply the statute as written.").

Our initial inquiry is to ascertain the legislative intent of the relevant statute. *See Ohio Cnty. Comm'n*, 171 W. Va. at 552, 301 S.E.2d at 184, Syl. Pt. 1. In this regard, the overarching legislative intent of the statutory scheme entitled "Motor Vehicle Dealers, Distributors, Wholesalers and Manufacturers," West Virginia Code §§ 17A-6A-1 to -18 (2021),[10] is set forth in West Virginia Code section 17A-6A-1 as follows:

> The Legislature finds and declares that the distribution and sale of motor vehicles in this state vitally affects the general economy and the public welfare and that in order to promote the public welfare and in exercise of its police power, *it is necessary to regulate motor vehicle dealers, manufacturers, distributors and representatives of vehicle manufacturers and distributors doing business in this state in order to avoid undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor* and to ensure that dealers fulfill their obligations under their franchises and provide adequate and sufficient service to consumers generally, and to protect and preserve the investments and properties of the citizens and motor vehicle dealers of this state.

---

[10] We note that many of the provisions of this statutory scheme were amended in 2022 and some were amended or added in 2024. None of the amendments affect the outcome of this case. As previously mentioned the 2015 version of the statute governs our decision herein. *See supra* note 2.

14

*Id.* (emphasis added); *see Thornhill Motor Car, Inc. v. Thompson,* 246 W. Va. 581, 587, 874 S.E.2d 693, 699 (2022) ("the Legislature . . . specifically intended to prevent 'undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor.'") (citing W. Va. Code § 17-6A-1)). It is beyond dispute that the statutory provision in the instant case is not concerned with the dealers fulfilling their obligations and providing adequate and sufficient service to their customers, but rather with the manufacturer's exercise of undue control over new motor vehicle dealers. *See* W. Va. Code §§17A-6A-1, -10. Thus, our examination of the relevant statutory language is guided by the Legislature's intent to prohibit motor vehicle manufacturers from exercising "undue control" over dealers.

We also recognize that judicial interpretation of the relevant statutory provision is necessary only if it is ambiguous. *See Ohio Cnty. Comm'n*, 171 W.Va. at 552, 301 S.E.2d at 184, Syl. Pt. 1. On this issue, we agree with the position taken by all the parties that the provisions of West Virginia Code section 17A-6A-10(1)(i) are plain and unambiguous and therefore we are constrained to apply the plain language of the statute as written and without judicial interpretation.

Turning to the plain, unambiguous language of West Virginia Code section 17A-6A-10(1)(i), the statute provides, in relevant part, that Ford, as a manufacturer, "*may not require any new motor vehicle dealer in this state*," i.e., the dealers herein, to do *any*

of the following . . . *[t]o coerce or require any dealer*, whether by . . . *incentive provision*[11] *or otherwise, . . . to install* new signs or *other franchisor image elements that replace or substantially alter those . . . franchisor image elements completed within the proceeding ten years that were required and approved by the manufacturer*[.] . . ." *Id.* (footnote added) (emphasis added).

Contrary to Ford's position that this case is easily resolved by "merely . . . confirming that the word 'required' as used in W. Va. Code [§] 17A-6A-10(1)(i)[] means 'required[,]'" we disagree.[12] The problem Ford faces is that resolution of the dispute does not depend solely on a definition of the word "required" but also on the context in which the word is used within the statute. In this regard, the relevant prohibition is not focused on the dealer's conduct, including the dealer's decision to participate in an optional, voluntary incentive program; rather, the focus is on the manufacturer's conduct. *Id.* Specifically, the conduct the statute seeks to obviate is the manufacturer offering of programs or incentive provisions which require a dealer to continually replace or

---

[11] "Incentive" is defined as "a payment or concession to stimulate greater output or investment[.]" *Incentive*, New Oxford Am. Dictionary (3d ed. 2010); *see also Incentive*, Webster's New World College Dictionary (5th ed. 2016) ("stimulating one to take action, work harder, etc.; encouraging, motivating, etc."). It is clear that under the common, ordinary meaning of "incentive" both the Facility Assistance Program and the LCP contained incentive provisions.

[12] In furtherance of its argument, Ford relies not on any dictionary definition of "required" but only on antonyms for the word, maintaining that "something that is 'required' by definition, cannot be 'voluntary.'" According to the New Oxford American Dictionary, "require" is defined as "need for a particular purpose[,]" and "cause to be necessary[.]" *See Require*, New Oxford Am. Dictionary (3d ed. 2010).

16

substantially alter previous "required and approved" franchisor image elements in order to maintain reasonable competitive balance. In enacting West Virginia Code section 17-6A-10(1)(i), the Legislature recognized that programs and incentive provisions were one way in which manufacturers could exercise undue control over dealers, and prohibited the tactical use of such programs by deeming the previously installed franchisor image elements "to be in compliance with the program requirements pertaining to construction of facilities or installation of signs or other franchisor image elements that would replace or substantially alter those previously constructed or installed with that ten year period." *Id.*

Returning to the facts of the instant case, our focus is on the Facility Assistance Program offered by Ford to its dealers, pursuant to which the dealers were eligible to receive matching funds up to $750,000 for performing renovations to their facilities – renovations which were beneficial to Ford in that the dealers' renovated facilities would be more likely to attract would-be purchasers of Ford and Lincoln vehicles. However, in order to receive those matching funds, participating dealers in the program were required to install "franchisor image elements" and "meet Ford Trustmark standards," all of which were design element details that were both "required and approved" by Ford. Succinctly stated, it is of no moment that the dealers opted into the program voluntarily; the focus of the statute is on Ford's conduct in requiring those dealers to install signs and franchisor image elements that were both "required and approved" by Ford. *See id.* Had the dealers subsequently elected to participate in the LCP, Ford would have required them to install new signs and franchisor image elements to replace or substantially alter those

17

previously "required and approved" by Ford under the Facility Assistance Program. Thus, because the dealers had previously installed signs and franchisor image elements that were required and approved by Ford in the ten years preceding the offer of the LCP, the grandfather clause set forth in West Virginia Code section 17A-6A-10(1)(i) applied to Ford's new LCP facility program which offered monies based on the changing of the franchisor image elements required and approved by Ford.

As set forth *supra*, had the Legislature intended for a dealer's participation in a voluntary program or incentive provision offered by a manufacturer to render this particular statutory provision a nullity, it would have so stated; however, the statute fails to make any such distinction. Moreover, Ford's overly simplistic argument overlooks the Legislature's clear, expressed intent to prevent manufacturers from exerting undue control over dealers through programs and incentive provisions, whether voluntary, optional, or mandatory. Instead, Ford asks this Court to find that whether or not the manufacturer "required and approved" franchisor image elements as part of an incentive program, the fact that a dealer voluntarily undertook to participate in that program and construct facility improvements (including installing franchisor image elements) renders the statutory grandfather clause inapplicable. To adopt such a reading would require this Court to ignore both cardinal rules of statutory construction and the clearly expressed legislative intent to protect dealers from manufacturer's exercising undue control through programs and incentive provisions. *See State ex rel. Frazier,* 193 W.Va. at 24, 454 S.E.2d at 69 ("Courts are not free to read into the language what is not there, but rather should apply the statute

18

as written."). To accept Ford's position that this statute does not apply to the facts of this case because "plaintiffs concede that their prior facilities improvements and installation of image elements were undertaken voluntarily, and were not required by Ford[,]" defeats the purpose of the statute and renders it meaningless. *See State ex rel. Hardesty,* 147 W. Va. at 645, 129 S.E.2d at 922, Syl. Pt. 4.

Accordingly, we hold that a new motor vehicle dealer's completion of renovations, improvements, or the installation of signs or franchisor image element upgrades in accordance with the requirements of a manufacturer's optional program or incentive provision constitutes installation of signs or franchisor image elements "required and approved" by the manufacturer such that the ten-year grandfather clause set forth in West Virginia Code section 17A-6A-10(1)(i) (2015) applies. In so holding, we agree that the dealers made significant investments when they constructed new facilities in accordance with the requirements of Ford's Trustmark program. By participating in this program, the dealers installed franchisor image elements that were undeniably required and approved by Ford. The clear intent of the relevant statute is to protect the dealers' investments in Ford's required and approved franchisor image elements for a period of ten years from the completion of the relevant installations.

## IV. Conclusion

For the foregoing reasons, the certified question posed by the district court is answered in the affirmative.

Certified Question Answered.